**ATWOOD HATCHERIES, Appellant,**

v.

**HEISDORF & NELSON FARMS,**
**Appellee.**

**No. 22042.**

United States Court of Appeals
Fifth Circuit.

March 10, 1966.

Rehearing Denied April 5, 1966.

---

Wallace S. Craig and Clyde, Hines & Craig, Fort Worth, Tex., for appellant.

Victor D. Lawrence, Seattle, Wash., Howard Barker, Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., Roberts, Shefelman, Lawrence, Gay & Moch, Timothy R. Clifford, Seattle, Wash., Howard Barker, Fort Worth, Tex., Victor D. Lawrence, Seattle, Wash., of counsel, for appellee.

Before RIVES, BROWN and MOORE,* Circuit Judges.

* Of the Second Circuit, sitting by designation.

JOHN R. BROWN, Circuit Judge:

The broad legal question here is whether the Texas Long Arm statute [1] tries to reach as far as the State of Washington and, concluding that Texas would hardly grope for less than its reach, whether the Federal Constitution reduces the grasp. Reduced to the biologico-legal terms of this record, the question in the *Hanson-Denckla* [2] concept is whether the corporation has " * * * purposefully [availed] itself of the privilege of conducting activities within the * * * State" when, under the contractual relationship, in addition to a few roving human inspectors, visitors, veterinarians, or ambassadors of good will coming to Texas, its regular representatives are pure bred male chicks under a sort of fowl bare-boat charter-lease whose Texas mission is to fertilize the eggs of purchased female chicks of like lineage whose progeny is to carry on the good name of the strain to the mutual advantage of the Vendor-Lessor and Buyer-Lessee.

The District Court, after removal [3] of the cause from the State Court by the nonresident Defendant Washington corporation,[4] sustained the motion to dismiss for want of jurisdiction over the person of the Defendant. We disagree and reverse.

The facts are without material dispute. Heisdorf and Nelson Farms, the Vendor-Lessor, is a State of Washington corporation engaged in the chicken breeding business. Vendor-Lessor entered into a written franchise hatchery contract with appellant Atwood Hatcheries, a Texas corporation, the Buyer-Lessee. The Buyer-Lessee brought this suit in the Texas State Court alleging that Vendor-Lessor breached the franchise hatchery contract

1. Vernon's Tex.Rev.Civ.Stat.Ann. art. 2031b:

"Art. 2031b. Service of process upon foreign corporations and nonresidents.

" * * * *

"Sec. 2. When any foreign corporation, * * * though not required by any Statute of this State to designate or maintain an agent [for process], shall engage in business in this State, in any action in which such corporation * * * is a party or is to be made a party arising out of such business, service may be made by serving a copy of the process with the person who, at the time of the service, is in charge of any business in which the defendant or defendants are engaged in this State * * *.

" * * * *

"Sec. 4. For the purpose of this Act, and without including other acts that may constitute doing business, any foreign corporation * * * shall be deemed doing business in this State by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State * * *."

2. Hanson v. Denckla, 1958, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283.

3. Nonresidents apprehensive that in our *Erie* [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] rule we put too much muscle in these state Long Arm statutes (see, e. g., Delray Beach Aviation Corp. v. Mooney Aircraft, Inc.,

5 Cir., 1964, 332 F.2d 135, cert. denied, 1964, 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 185; Lone Star Motor Import, Inc. v. Citroen Cars Corp., 5 Cir., 1961, 288 F.2d 69; Bluff Creek Oil Co. v. Green, 5 Cir., 1958, 257 F.2d 83) need run this risk no longer in Texas cases. The Supreme Court of Texas has now promulgated a rule of procedure (Tex. Rules of Civil Procedure, rule 120a) to permit a special appearance thus making it unnecessary, and in many ways now inappropriate, for us to be "making" Texas law on jurisdiction over nonresidents, a responsibility foisted on us. See Thode, "In Personam Jurisdiction; Article 9031b, The Texas 'Long Arm' Jurisdiction Statute; And The Appearance to Challenge Jurisdiction in Texas and Elsewhere," 42 Texas Law Rev. 279, 310–341. See also Lone Star Motor Import, Inc. v. Citroen Cars Corp., supra, 288 F.2d at 73; Acme Engineers, Inc. v. Foster Engineering Co., 5 Cir., 1958, 254 F.2d 259, 262.

4. Since the Court did not merely quash the service of process, it presumably thought that under no circumstances was this nonresident corporate defendant amenable. This assumption appears doubtful especially in view of amended F.R.Civ.P. 4(e) now permitting use of state quasi in rem procedures to obtain process. See Stanga v. McCormick Shipping Corp., 5 Cir., 1959, 268 F.2d 544, 554 (Part XII).

and seeking damages therefor. Service of process was accomplished on Vendor-Lessor's general manager while he was attending a national convention in Dallas, Texas. Buyer-Lessee's State Court petition acknowledged the Defendant's nonresident status and stated that Vendor-Lessor is "engaged in and doing business in the State of Texas by virtue of the fact that [it] * * * leases to the Plaintiff, male chickens for the purpose of breeding stock." The Vendor-Lessor removed the case to the federal District Court and filed a motion to dismiss on the ground that the Court lacked jurisdiction over it, inasmuch as its contacts with the State of Texas were insufficient to render it subject to the jurisdiction of a Court of that State. The "contacts" with the State of Texas were developed by affidavit,[5] which establishes that Vendor-Lessor had from time to time entered[6] into as many as five separate franchise hatchery contracts with Texas hatcheries. In addition Vendor-Lessor employed three field representatives, one of whom calls on the Texas franchise hatcheries for consultation and advise three or four times a year. The field representatives are not authorized to and do not solicit or accept orders. On rare occasions, however, an order may be communicated through a field representative to Vendor-Lessor's Washington office. Also on rare occasions a geneticist or veterinarian employed by Vendor-Lessor visits and consults with a Texas franchise hatchery.

None of Vendor-Lessor's places of business are located in Texas. Except for its leased male chicks, it has never maintained a stock of goods, nor does it maintain a bank account, or telephone listing in Texas. It has never had any employees, agents, or representatives regularly residing in Texas. And whether it ought to have or not, it has never paid taxes to Texas.

█ It is an understatement to say that the contract[7] is extraordinary. Neither for this Buyer-Lessee nor for the other four in Texas is it a single shot proposition. Rather, it contemplates a continuing relationship with the joint use of breeding stock under the most careful restrictions and supervisory powers to assure the maintenance of a good public image and the purity and poultry soundness of the Leghorn chickens introduced into Texas under Vendor-Lessor's "H&N-Nick Chick" trade name. The opening line of the contract recites that Vendor-Lessor, "engaged in the business of poultry breeding, * * * has developed special breeding stocks * * * with distinctive family lines not available to the public * * *." Par. 1 provides for the sale to Buyer-Lessee of "parent female chicks" subject to all "terms, conditions, and restrictions of this" contract. Subject to similar conditions, in par. 2 Vendor-Lessor agrees "to lease to [Buyer-Lessee] sufficient sexed H&N 'Nick Chick' Leghorn parent stock male chicks for mating only with like sexed H&N

---

5. With its motion to dismiss, Vendor-Lessor filed the "affidavit of Arthur Heisdorf in support of motion to dismiss."

6. The affidavit states that each Texas franchise hatchery contract "was entered into when the defendant [Heisdorf] affixed its signature to the contract at its principal office in the State of Washington, and was not entered into in the State of Texas." See note 14, infra.

7. It is little wonder that the trial Court made a misstep as to contract Long Arm. The Buyer-Lessee made no factual response to the Vendor-Lessor's affidavit (note 5, supra) which referred to the contract but did not set it forth. At the heart of the case, it is made available to us by an exhibit to a brief to which Vendor-Lessor withdrew objections provided we accepted its contention that it had not in fact exercised within Texas any of the numerous supervisory powers reserved. Accepting this, as we do, it is without legal significance for it is the retention of powers, and not the exercise thereof, that is important. See generally Sun-X Glass Tinting, Inc. v. Sun-X Int'l, Inc., W.D.Wis., 1964, 227 F.Supp. 365; Kearns v. Seven-Up Co., E.D.Pa., 1961, 32 F.R.D. 238; American Type Founders Co. v. Mueller Color Plate Co., E.D.Wis., 1959, 171 F.Supp. 249.

'Nick Chick' Leghorn parent stock females purchased by" Buyer-Lessee. Presumably because this has some relation to production or productivity, Vendor-Lessor at its discretion is to fix the "ratio of male chicks to be leased for mating." Under par. 2 the activities of these leased male chicks are carefully circumscribed during life and even life itself, the time and consequences of death are likewise controlled.[8] Under par. 6 Buyer-Lessee agrees that the "parent stock female chicks purchased and male chicks leased * * * will be used to produce hatching eggs to the extent that [Buyer-Lessee] can obtain sales for H&N 'Nick Chick' Leghorns * * *" and that it "will make certain that any eggs produced by such chicks * * * which are not acceptable for hatching purposes will be placed in commercial egg market channels for human consumption only * * *." Par. 7 prescribes that "No person other than [Buyer-Lessee] shall be permitted to hatch any eggs produced by the H&N parent stock chickens purchased and leased * * *."

Under par. 8 Buyer-Lessee agrees to "take necessary action to insure that all H&N parent stock * * * are carefully and continually supervised and inspected * * *." To "avoid the possibility of H&N parent stock * * * becoming mixed with other chickens or eggs * * *," Buyer-Lessee agrees under par. 9 that it will "not keep or maintain * * * any White Leghorn or other white egg commercial laying type chickens except breed crosses or H&N parent stock." All of this is made doubly sure in par. 10 in which Buyer-Lessee agrees "that positive measures will be taken * * * to absolutely insure that female H&N parent stock 'Nick Chick' Leghorns purchased hereunder will be mated only to male H&N parent stock 'Nick Chick' Leghorns leased hereunder. * * *" Complete segregation is required.[9] And by par. 11 Buyer-Lessee agrees to "keep its premises * * * clean and orderly to the satisfaction of [Vendor-Lessor]" and to "use * * * skill and judgment in accordance with good poultry husbandry in raising, housing, feeding, managing and testing all H&N parent stock chickens * * *," which activities "shall be open to inspection by" Vendor-Lessor "at all reasonable times."[10]

And if successful in raising the chicks to the point of sale, Buyer-Lessee's right to sell is severely circumscribed. Buyer-Lessee agrees "that all chicks hatched from eggs produced by the H&N parent stock chickens purchased and leased * * * will be sold under the name of Atwood Hatcheries, Inc. H&N 'Nick Chick' Leghorns" (par. 6) and if sold "through the agency of dealers or other sales outlets * * *," this may be done "only if a written contract has been entered into * * * after being first approved by [Vendor-Lessor]" (par. 16). Moreover, in the non-poultry phases the

---

8. "Females carried over into a second mating year shall be mated only with like male chicks in their first mating year. Should [Buyer-Lessee] carry over the females purchased from [Vendor-Lessor] into a second mating year, [Vendor-Lessor] will lease to [Buyer-Lessee] sufficient like male chicks for mating only with said females in the second mating year * * *."

Vendor-Lessor's ownership continued. "Title to all male chicks shall at all times be and remain with [Vendor-Lessor] * * *. At the end of each mating year, [Buyer-Lessee] will either kill the leased males or sell the same as commercial meat for human consumption under arrangements which will positively assure that they cannot be used for breeding * * *."

9. Par. 10 directs that "adequate safeguards will be taken by [Buyer-Lessee] * * * to guarantee that the H&N parent stock 'Nick Chick' Leghorns will be kept and maintained in houses and pens separate from any other chickens so that they cannot become intermingled * * *."

10. Under par. 12, Vendor-Lessor is given the right "at any time" to inspect and test all H&N parent stock and "without liability" it may "kill any chickens which in [its] opinion are undesirable as ancestors of H&N 'Nick Chick' Leghorns."

Buyer-Lessee put itself under the domination of Vendor-Lessor. Thus the Buyer-Lessee binds itself to maintain good books and records subject to audit at any time by Vendor-Lessor (par. 17) and to "submit * * * whenever requested, copies of all printed advertising, and radio and television scripts, concerned with the sales * * * of H&N 'Nick Chick' Leghorns" and to discontinue their use if "disapproved by [Vendor-Lessor]" (par. 18). The contract was for an indefinite period terminating only after 60 days' notice plus—in a sort of a poultry-perpetuity rule—the lives in being of the chicks, chickens, male, female, purchased or leased.[11]

It is against this relationship that Texas and Federal policies must be assayed.

■ The problem of whether a foreign corporation may be subjected to the jurisdiction of the courts of the forum state divides itself along lines of state and national interest. The first inquiry is whether state law provides for the exercise of jurisdiction under the circumstances of the case presented. Conditioned on an affirmative answer to this is the question whether the exercise of jurisdiction pursuant to state law violates the Federal Constitution.[12]

■ The precision of Revised Civil Statutes of Texas article 2031b eliminates the first inquiry.[13] Article 2031b (note 1, supra) authorizes the exercise of jurisdiction over a foreign corporation where it is "doing business" in Texas. And "doing business" is defined to include "entering into contract by mail or otherwise [14] with a resident of Texas to be performed in whole or in part by either party in this State * * *." Since the exigencies of the case as a prelude to the discussion of the Federal question require it, we now declare what was more hesitatingly suggested in Lone Star [15] and even more guardedly assumed in Jack Tar [16] that "the Texas purpose [in enacting article 2031b] was to exploit to the maximum the fullest permissible reach under federal constitutional restraints." [17]

---

11. Under par. 20, either party can terminate upon 60 days' notice, but liabilities continue "so long as [Buyer-Lessee] shall keep any H&N parent stock chickens sold or leased * * * hereunder * * *." And it was not over until the last cock crowed for Buyer-Lessee agrees "to give immediate possession to [Vendor-Lessor] of all males leased * * *, or at [Vendor-Lessor's] direction" Buyer-Lessee "will immediately kill all of the leased males or sell them as commercial meat for human consumption under arrangements which positively assure that they cannot be used for breeding * * *" (par. 20).

12. The two aspects to this problem are set forth and discussed in Lone Star Motor Import, Inc. v. Citroen Cars Corp., 5 Cir., 1961, 288 F.2d 69, 72; Stanga v. McCormick Shipping Corp., 5 Cir., 1959, 268 F.2d 544, 548; and Rosenthal v. Frankfort Distillers Corp., 5 Cir., 1951, 193 F.2d 137, 141. See also Pliler v. Asiatic Petroleum Co., S.D.Tex., 1961, 197 F.Supp. 212; 1 Barron & Holtzoff Federal Practice and Procedure § 179 p. 675, 696–98 (1960); 2 Moore Federal Practice § 4.25 [1] p. 1147 (1964).

13. Atwood suggests that jurisdiction over Vendor-Lessor is authorized by Vernon's Tex.Pen.Code Ann. art. 1525b (Vernon's Supp.1964). Since art. 2031b provides ample jurisdiction, we need not consider this.

14. In the Texas view, the place or time of "execution," "consummation," or "delivery" is inconsequential. It is performance, contemplated or accomplished, which is important. See note 6, supra.

15. Lone Star Motor Import, Inc. v. Citroen Cars Corp., 5 Cir., 1961, 288 F.2d 69, 73.

16. Turner v. Jack Tar Grand Bahama, Ltd., 5 Cir., 1965, 353 F.2d 954 [Dec. 10, 1965].

17. See Thode, In Personam Jurisdiction; Article 2031b, the Texas "Long Arm" Jurisdiction Statute: And the Appearance to Challenge Jurisdiction in Texas and Elsewhere, 42 Texas L.Rev. 279, 301–08 (1964); Comment, 39 Texas L. Rev. 214 (1960). See generally Currie, The Growth of the Long Arm: Eight Years of Extended Jurisdiction in Illinois, 163 U.Ill.L.F. 533; Horowitz, Bases of Jurisdiction of California Courts to Ren-

In this setting there can be no doubt that Texas intends—if it has the power —to reach this contract and the parties to it.

 Now posed is the second question —whether the Texas statute as thus applied offends the Federal Constitution. Constitutional restrictions on the power of a state to acquire jurisdiction over a foreign corporation have been the subject of several recent and far-reaching decisions of the Supreme Court.[18] The more restrictive notions of Pennoyer v. Neff, 1877, 95 U.S. 714, 24 L.Ed. 565, were discarded in International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and replaced by the "minimum contacts" principle.[19] This principle was continued and expanded in further decisions,[20] culminating in McGee v. International Life Ins.

Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223.[21] McGee was followed by Hanson v. Denckla, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, which served notice that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." [22]

 Turning to the case at hand, it is apparent that Vendor-Lessor's activities in Texas satisfy the federal constitutional requirements. It entered into contracts with several Texas hatcheries. It collects rentals and royalties under these contracts. It retains ownership of the male chicks leased to the Texas hatcheries. It reserved detailed, far-reaching, systematic, and continuous supervisory rights over all Texas activities, thus en-

der Judgments against Foreign Corporations and Non-Resident Individuals, 31 So.Cal.L.Rev. 339 (1958); Stinson, Omnibus Statutes Designed to Secure Jurisdiction over Out-of-State Defendants, 48 A.B.A.J. 725 (1962); Note, 37 Ind.L.J. 333 (1962); Note, 38 Wash.L.Rev. 560 (1963).

18. See generally 1 Barron & Holtzoff, op. cit. supra note 12, § 179 pp. 683–694; 2 Moore, op. cit. supra note 12, §§ 4.25[3]– [5]; Kurland, The Supreme Court, The Due Process Clause and the In Personam Jurisdiction of State Courts, 25 U.Chi. L.Rev. 569 (1958); Reese and Galston, Doing an Act or Causing Consequences as Bases of Judicial Jurisdiction, 44 Iowa L.Rev. 249 (1959); Note, 47 Geo.L.J. 342 (1958). See also authorities cited note 17, supra.

19. "[D]ue process requires only that in order to subject a defendant to judgment in personam * * * he have certain minimum contacts with it [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95. The Court emphasized that the determination of "minimum contacts" is not simply quantitative, but rather depends on the quality and nature of the activity of the foreign corporation in the forum state, and that an "estimate of the inconveniences" to the parties is relevant.

20. See Perkins v. Benguet Consol. Mining Co., 1952, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485; Travelers Health Ass'n v. Com. of Virginia, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154.

21. "Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other non-residents. * * * It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that [forum] State. * * *" McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 222–223, 78 S.Ct. 199, 2 L.Ed.2d 223.

22. 357 U.S. at 253, 78 S.Ct. at 1240. See Dooly v. Payne, 5 Cir., 1964, 326 F.2d 941, 943: "The McGee case was followed * * * by Hanson v. Denckla which teaches that, although the door of non-resident jurisdiction has been opened wider by International Shoe and McGee, it has not been removed from its hinges * * *." Accord, Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 5 Cir., 1964, 332 F.2d 135, 139, cert. denied, 1964, 379 U.S. 915, 85 S.Ct. 262, 13 L. Ed.2d 185. See also Roumel v. Drill Well Oil Co., 5 Cir., 1959, 270 F.2d 550: "The majority [in Hanson] did not indicate that it was taking back anything said in McGee [or] International Shoe Co. * * *."

abling it to exploit completely the economic potential of the Texas market and all the while preserving its trade reputation, integrity, and the salability nationwide of H&N 'Nick Chick' Leghorns. Added to this, occasionally field representatives, geneticists, veterinarians, or the like employed by Vendor-Lessor traveled to Texas for consultation with the Texas hatcheries with the mutual aim of making business, the chick business, better and better. And, finally, it is out of this contractual arrangement that the controversy in suit arose.

Texas has an immediate and continuous interest in this continuing relationship. The Vendor-Lessor believes that Texas needs its special breed of "H&N Nick Chick." So much so that it sets up an elaborate mechanism to assure the purity and perfection of the strain. More than that, Vendor-Lessor believes it needs Texas, and the business profits the Texas business will generate. Cf.

Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 5 Cir., 1964, 332 F.2d 135, cert. denied, 1964, 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 85. From the Texas point of view the Vendor-Lessor must take the bitter—amenability to personal jurisdiction—with the sweet.

In engaging in these activities Vendor-Lessor purposefully availed itself of the privilege of conducting business in Texas, thus invoking the benefits and protections of Texas law. It assumed the risk of trial in Texas in choosing to come into this State.[23] We therefore hold that a Court of Texas may, consistent with the Federal Constitution and without offending "traditional notions of fair play and substantial justice," assert jurisdiction over a foreign corporation under the circumstances of this case.[24]

The cause must therefore be reversed and remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

23. An estimate of the inconveniences to the parties results in a stand-off; while trial in Texas will present hardships for Vendor-Lessor, similar hardships will be imposed on Buyer-Lessee by trial in some other state.

24. See United States v. Montreal Trust Co., 2 Cir., 1966, 358 F.2d 239 [Jan. 6, 1966]; Elkhart Eng'r Corp. v. Dornier Werke, 5 Cir., 1965, 343 F.2d 861; Buckley v. New York Times Co., 5 Cir., 1964, 338 F.2d 470, 475 (dissenting opinion); Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 5 Cir., 1964, 332 F.2d 135, cert. denied, 1964, 379 U.S. 915, 85 S.Ct. 262, 13 L.Ed.2d 185; Calagaz v. Calhoon, 5 Cir., 1962, 309 F.2d 248; Westcott-Alexander, Inc. v. Dailey, 4 Cir., 1959, 264 F.2d 853; Stanga v. McCormick Shipping Corp., 5 Cir., 1959, 268 F.2d 544 (dissenting opinion); National Gas Appliance Corp. v. AB Electrolux, 7 Cir., 1959, 270 F.2d 472, cert. denied, 1960, 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.2d 740; Bluff Creek Oil Co. v. Green, 5 Cir., 1958, 257 F.2d 83; Acme Eng'rs, Inc. v. Foster Eng'r Co., 5 Cir., 1958, 254 F.2d 259; WSAZ, Inc. v. Lyons, 6 Cir., 1958, 254 F.2d 242; Parmalee v. Iowa State Traveling Men's Ass'n, 5 Cir., 1953, 206 F.2d 518, 44 A.L.R.2d 410, cert. denied, 1953, 346 U.S. 877, 74 S.Ct. 125, 98 L.Ed. 384; Hearne v. Dow-Badische Chem. Co., S.D. Tex., 1963, 224 F.Supp. 90; O'Brien v. Lanpar Co., Tex., 1966, 399 S.W.2d 340 [Feb. 2, 1966]. But see Agrashell, Inc. v. Bernard Sirotta Co., 2 Cir., 1965, 344 F.2d 583; Continental Nut Co. v. Robert L. Berner Co., 7 Cir., 1965, 345 F.2d 395; Buckley v. New York Times Co., supra; Walker v. Savell, 5 Cir., 1964, 335 F.2d 536; Blount v. Peerless Chem. (P.R.) Inc., 2 Cir., 1963, 316 F.2d 695, cert. denied, Colbert v. Peerless Chemicals (P. R.) Inc., 1963, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62; Long v. Victor Prods. Corp., 8 Cir., 1961, 297 F.2d 577; Roumel v. Drill Well Oil Co., 5 Cir., 1959, 270 F.2d 550; Stanga v. McCormick Shipping Corp., supra; Trippe Mfg. Co. v. Spencer Gifts, Inc., 7 Cir., 1959, 270 F.2d 821; L. D. Reeder Contractors v. Higgins Indus., Inc., 9 Cir., 1959, 265 F.2d 768.