George **REUL** et ux.

v.

**SAHARA HOTEL** et al.

Civ. A. No. 72–H–629.

United States District Court,
S. D. Texas,
Houston Division.

March 19, 1974.

Ernest H. Cannon, Brown, Kronzer, Abraham, Watkins & Steely, Houston, Tex., for plaintiff.

John H. Boswell, Boswell, O'Toole, Davis & Pickering, Houston, Tex., for Sahara Hotel.

Sam H. Hood, Jr., Fulbright, Crooker & Jaworski, Houston, Tex., for Jones Chemicals, Inc.

Memorandum and Order

SINGLETON, District Judge.

Plaintiffs in this products liability tort action are George and Kay Reul.

The suit arises out of an incident which occurred on or about September 11, 1970. Plaintiff George Reul was a guest at the Sahara Hotel in Las Vegas, Nevada, when he was injured by an explosion of a chlorine tank which occurred near the pool area of the hotel. The plaintiffs allege that the tank had

been supplied to the Sahara Hotel and was maintained by the defendants Jones Chemicals, Inc., a New York corporation, Jones Chemicals, Inc., a New York Corporation, d/b/a J. W. Jones, Inc., and Jones Chemicals, Inc., Western Division, a California corporation. The plaintiffs have sued all three of these entities on the theories of strict liability or negligence. They allege further that the three entities were engaged in the business of selling such products and that they were expecting the product to reach, and the product did reach, the Sahara Hotel without substantial change in the condition in which it was sold.

Defendants are the Sahara Hotel, Jones Chemicals, Inc., a New York corporation, Jones Chemicals, Inc., a New York Corporation d/b/a J. W. Jones, Inc., and Jones Chemicals, Inc., Western Division, a California corporation. Plaintiffs reside in Harris County, Texas. The Sahara Hotel is a Nevada corporation doing business in Texas, and as to it there has been no problem of jurisdiction. Jones Chemicals, a New York corporation, has a permit to do business in Texas under the name of J. W. Jones, Inc.; has been served; and has answered. Plaintiffs allege that the defendant Jones Chemicals, Western Division, does business in Texas through its parent corporation. Jones Chemicals, Inc., Western Division, maintains no registered agent in Texas and is incorporated under the laws of California. The California corporation was served by way of the Secretary of State of Texas in Austin, in accordance with Article 2031(b) of the Vernon's Annotated Revised Civil Statutes of Texas. Notice of the suit was mailed to J. K. Galliger, secretary of the corporation, at its principal place of business in Torrence, California.

At this point there is no problem with defendant Sahara Hotel. There is no problem with Jones Chemicals, Inc., a New York corporation, or its branch office in Texas which does business by permit as J. W. Jones, Inc. These are admittedly the same corporation and have answered in the suit. The defend-

ant Jones Chemicals, Inc., Western Division, a California corporation, has vigorously objected, however, to the maintenance of the suit as to it. Several of its objections are easily answered.

■ Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is clearly unfounded. The amount in controversy is in excess of $10,000 and between citizens of different states. Clearly, then, this case falls within 28 U.S.C.A. § 1332, giving the district courts of the United States original jurisdiction.

■ Defendant's Motion to Dismiss for Lack of Venue Over the Defendant or Subject Matter is also clearly unfounded. 28 U.S.C.A. § 1391(a) provides: "A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose." Mr. and Mrs. Reul, the only plaintiffs, both reside in the Southern District of Texas. Thus, venue is clearly proper in accordance with that statutory provision.

■ Defendant's Motion to Quash Service and to Dismiss for Want of Proper Service, for Lack of Jurisdiction Over the Defendant, and for Insufficiency of Service of Process is concerned with essentially the same question of law. The question resolves itself into one of whether or not this court has jurisdiction over the person of the California corporation via the Texas long arm statute.

The California corporation has neither sold nor solicited the sale of any products or service on its own behalf in the state of Texas; has not received any income from the sale of any products of service in Texas arising solely out of its "divisional" operation; has not been granted a permit to do business in Texas; and owns no property in Texas in its "divisional" name. These facts are undisputed. The plaintiffs nevertheless are asserting that this court has juris-

diction over the defendant California corporation. The question presented is a unique one, possibly one of first impression in its particular posture: Is the relationship between the parent New York corporation, which assuredly does business in the state of Texas, and the subsidiary California corporation one which allows a court to find that the doing of business of the parent corporation can be imputed to the subsidiary so that Texas can acquire in personam jurisdiction over the California corporation? Couched in slightly different terms, the question becomes: Is the phrase "doing business" used in the Texas long arm statute broad enough to cover a situation such as the one presented here?

█ It is important to note at this juncture that the court is not faced yet with the question of holding the parent corporation liable for the acts of its subsidiary California corporation or vice versa. That question may have to be reached eventually, but the court believes the legal test of liability is different from and should be more stringent than a legal test relating to the amenability of process and forum. For that reason the many, many cases which treat the liability question are of limited value. *Cf.* Bland v. Kentucky Fried Chicken, 338 F.Supp. 871, 875 (S.D.Tex. 1971).

Unfortunately, the court is faced with no clearly articulated standard in this area. Although there are cases in the general area, each seems to be decided on its own peculiar facts. Many Texas state courts and federal courts have discussed the scope of the Texas long arm statute, and it is a well-settled fact that the statute will "reach [as far] as due process will permit." Atwood Hatcheries v. Heisdorf & Nelson Farms, 357 F. 2d 847 (5th Cir. 1966); Eyerly Co. v. Killian, 414 F.2d 591 (5th Cir. 1969); Jetco Electronic Industries, Inc. v. Gardiner, 473 F.2d 1228 (5th Cir. 1973).

The Texas long arm statute is very long and involved. In parts relevant to this case, it reads:

Art. 2031b. Service of process upon foreign corporations and nonresidents

Failure to appoint agent; designation of Secretary of State as lawful attorney

Sec. 1. When any foreign corporation . . . subject to Section 3 of this Act, has not appointed or maintained a designated agent, upon whom service of process can be made . . . such corporation . . . shall be conclusively presumed to have designated the Secretary of State of Texas as their true and lawful attorney upon whom service of process or complaint may be made.

\* \* \* \* \* \*

Act of engaging in business in state as equivalent to appointment of Secretary of State as agent

Sec. 3. Any foreign corporation . . . that engages in business in this State . . . and does not maintain a place of regular business in this State or a designated agent upon whom service may be made upon causes of action arising out of such business done in this State, the act or acts of engaging in such business within this State shall be deemed equivalent to an appointment by such foreign corporation . . . of the Secretary of State of Texas as agent upon whom service of process may be made in any action, suit, or proceeding arising out of such business done in this State, wherein such corporation . . . is a party or is to be made a party.

Doing Business in state; definition

Sec. 4. For the purpose of this Act, and *without including other acts that may constitute doing business*, any foreign corporation . . . shall be deemed doing business in this State by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State, or the committing of any tort in whole or in part in this State. (Emphasis added.)

Most courts have been faced with the rather clear-cut question of finding a tort or a contract upon which to base the finding that the corporation was "doing business" in Texas. As Professor Thode pointed out in his historical treatise on Article 2031(b), however, the words "without including other acts that may constitute doing business," contained in § 4 of the article, were perhaps an inelegant attempt to keep the statute from being limited to torts and contracts. Thode, "In Personam Jurisdiction; Art. 2031(b), The Texas 'Long Arm' Statute; and the Appearance to Challenge Jurisdiction in Texas and Elsewhere," 42 Tex.L.Rev. 279 (1964). This court believes that that language is perfectly suited to the instant case. While the California corporation has clearly not committed a tort in Texas nor entered into a contract to be performed in Texas, its very relationship with its parent corporation gives rise to a situation in which its "acts . . . constitute doing business." Since there is no question that the New York parent is amenable to process in Texas and is within the court's jurisdiction, this court is convinced that the actual relationship between parent and subsidiary permits the California subsidiary to be amenable to process in Texas via 2031(b).

John Wiley Jones and his son Robert B. Jones own and control a tightly held family corporation based in Caledonia, New York. This corporation, alone or in connection with Jones family members, in turn owns four other corporations—one in California, one in North Carolina, one in Florida, and one in Indiana. All five of these corporations have branch offices located in cities throughout the country. The Houston branch of the New York corporation does business in Texas as J. W. Jones, Inc. The Nevada branch of the California corporation allegedly supplied to the Sahara Hotel the chlorine tank which exploded.

The New York parent corporation applied in 1970 for a permit to do business in Texas as J. W. Jones, Inc. The directors of the parent at that time were J. W. Jones, chairman of the board of directors, R. B. Jones, also president of the company, W. P. Fitzgerald, also senior vice president of the company, and Vito Pricola, also secretary-treasurer of the company. R. B. Jones was also the president of Jones Chemicals, Inc., Western Division, a California corporation, and W. P. Fitzgerald was the manager of the Western Division. Fitzgerald was also the secretary of the California corporation and a member of its board of directors, along with the two Joneses and Vito Pricola.

The court is well aware that ownership of all stock and the presence of common directors will not alone fuse the subsidiary into the parent corporation, either for the purposes of liability or for the purpose of establishing some sort of agency relationship. Turner v. Jack Tar, 353 F.2d 954 (5th Cir. 1965); Manney & Co. v. Texas Reserve Life Insurance Co., 407 S.W.2d 345 (Tex.Civ.App.—Dallas, 1966); Thompson v. Sinkler, 295 S.W.2d 508 (Tex.Civ.App.—Beaumont, 1956); Sutton v. Reagan & Gee, 405 S.W.2d 828 (Tex.Civ.App.—San Antonio 1966); Western Rock Co. v. Davis, 432 S.W.2d 555 (Tex.Civ.App.—Ft. Worth 1968); Bell Oil & Gas Co. v. Allied Chemical Corp., 431 S.W.2d 336 (Tex.Sup.Ct.1968); Hubbard v. Capital Southwest Corp., 448 S.W.2d 571 (Tex.Civ.App.—Waco 1969). Yet, the fact pattern as presented in the depositions taken relating to the questions before the court at this time leads to the conclusion that there is present here more than that amount of control of one corporation over another which mere common ownership and directorship would indicate.

In this connection, the career of Robert Graves is very instructive. He is presently in the employ of Carmichael Chemical Co., a California corporation. Jones Chemicals, Inc., New York, owns Carmichael. The relationship of Jones, Western Division, and Carmichael is very close. Jones Chemicals operates out of the Carmichael building, and the

sales staff of both apparently occupy the same office. Graves, who is a salesman, does work for both Jones and Carmichael but primarily for Carmichael. From his business card, it is evident that Jones handles chlorine, ammonia, acids, solvents, and chemicals for industry, whereas Carmichael handles "industrial chemicals." There is little or no competition between the two. Until Mr. Fitzgerald retired sometime in 1971, Graves received his instructions in the handling of Carmichael affairs "indirectly" from Mr. Fitzgerald.

Graves went to work for Jones Chemical Company in Charlotte, North Carolina, October 1, 1960, as a chemical salesman. At the outset he was sent to New York to familiarize himself with the Jones chemical products. At Charlotte, he testified, Jones has essentially the same setup as it has in Florida and California; that is, packaging chlorine, manufacturing hypochlorite, and packaging ammonia. He was paid from Caledonia, New York.

In the spring of 1961, Graves was transferred by John W. Jones, personally, to Jacksonville, Florida, to work as a salesman. Soon thereafter the manager there was transferred to Henderson, Nevada, and Graves became manager of the Jacksonville operation. While he was a branch manager for Jones (1962–1963), he was told from New York from whom to buy chemicals to fill orders. The purchases were made out of New York.

Graves stayed in Florida until 1963 when either John W. Jones or Robert Jones personally instructed him to go to Milpitas, California, and help start up an industrial business in the California branch. He worked in California from March 6 until July 1, 1963, when he returned to Florida. He had been paid through the Florida branch during the entire time he was in California.

When he returned to Florida, Graves was placed on "special assignment." He worked a few weeks in Jacksonville, a few weeks in St. Petersburg, and a few weeks in North Miami, promoting sol-

vents such as acetones and chlorinated hydrocarbons. When he worked in Florida, these new lines were beginning to develop. Graves testified that "Jones chemicals were basically chlorine, ammonia, and water-treatment chemicals."

Shortly thereafter, he went off "special assignment" and was told by one of the two Joneses to move back to California and establish himself in Torrence, California. He again became a salesman —this time for the Jones California corporation. He received instructions from the branch manager at Torrence, California, and the Western Division manager, W. P. Fitzgerald.

Graves worked for Jones Chemicals until November or December 1965 when he was moved "up" to Milpitas and went to work for Carmichael Chemical Co., in order to develop solvent business and to promote percoethylene for dry cleaning purposes. He continued with his Jones Chemicals accounts but made no new ones.

Graves is now paid by Carmichael Chemical Co. He receives a base pay and commission. The commission he receives from Jones sales also comes through Carmichael. He does not know how it is figured. His check is drawn on the Wells Fargo Bank, Milpitas, California, but comes from New York and is signed by John Wiley Jones.

Each week Graves reports his use of time to V. Pricola, R. B. Jones, and J. W. Jones in New York. He sends in one report but distinguishes his Carmichael activities and his Jones activities. At the end of the month another report (a commission report) is sent in. This report goes to the payroll department in Caledonia, New York. The reports are addressed to Jones Chemicals, there being no Carmichael Chemicals in New York.

In 1970, Mr. Fitzgerald, the Western Division manager, told Graves to go to Houston to "make some surveys, contact some municipals, get on bidders' lists." These instructions were all oral. Graves would spend two weeks in Houston, and

Mr. Fitzgerald would spend two weeks in Houston, from February to November of 1970. While Graves worked on this job, his salary was paid by Carmichael Chemical Co., and he made no commissions on his sales in Texas.

The Jones chemical plant for Houston was still under construction, and Mr. Graves worked out of a Holiday Inn. In June or July, 1970, business cards were printed in Caledonia and sent down. At this point, an office in Texas was being established, furnished, and staffed; and a branch manager was employed.

Graves' career alone is strong indication of the manner in which the operations of the Jones companies are conducted. A good man, such as Mr. Graves, is transferred all over the country to whichever plant or branch he is needed. His salary is paid by the corporation in whose employ he remains for any significant period of time, but this does not prevent his being transferred to other locations for shorter periods when a job needs doing. His instructions are received orally from one of the Joneses or from Fitzgerald. He reports his sales efforts and commissions to Pricola and the Joneses personally. The Joneses know everything that is going on in all of their corporations. Such a situation is not limited to California. Graves testified that he was a branch manager in Florida and received instructions on what to buy and sell directly from New York.

The officers of the New York and California corporations are for the most part common; and, what is more significant to this court, the senior vice president and director of the parent company was also the manager of the operations of the Western Division. He also indirectly controlled the Carmichael operations. This same man, Fitzgerald, wearing one of these three or four hats, recruited a Carmichael-Western Division employee, Graves, to aid him in setting up a Houston branch of the New York parent. This they did for almost the full year of 1970. Graves was not working for Carmichael two weeks of the month; yet, his check, figured in New York, continued to come from Carmichael.

While the Jones family of corporations may, on paper, look like separate entities for bookkeeping convenience and tax purposes, they are for all *operational* purposes one big, albeit well organized, corporation controlled from the top by John Wiley Jones, his son Robert B. Jones, and a few trusted employees such as Vito Pricola and R. P. Fitzgerald.

All of the business is conducted out of Le Roy or Caledonia, New York. Caledonia, New York, is also the home office of the New York parent corporation from which the New York corporation conducts essentially the same sort of business as its subsidiaries do throughout the nation. Nationwide, all invoices and remittances are to be paid to Jones Chemicals, Inc., in New York. A computer is maintained in New York to take care of the bookkeeping operations for all the corporations. The New York parent maintains a chemical laboratory in Caledonia, and this is the only laboratory for all five corporations. The check from the Sahara Hotel was endorsed "J. W. Jones Co., Inc." when it was cashed by the corporation. One insurance policy carries all five corporations and their branches as insureds; the policy is paid out of New York. When new cylinders are ordered, they are ordered by the New York corporation for the subsidiaries. One safety engineer is hired by the New York corporation for its benefit and for the benefit of the other four corporations. He works for the New York company but is on call for any of the other four. He makes periodic trips to the other four corporations to check on their safety procedures. Safety bulletins and instructions come from New York.

In advertising the company, the Jones corporations are not distinguished as five corporations. The company purports to be a nationwide corporation. It has one slogan: "Jones—a good name in chemicals." It has one trademark: the face of a little "sunny-sol." The compa-

ny is advertised in the Thomas Register and in other trade publications as being one company with many branch offices nationwide. In 1972, the company put out an advertising brochure. The brochure was designed, under the personal direction of Robert Jones, by a New York-based advertising agency. Mr. Pricola testified that there is nothing in the practices or procedures of the company which has changed with the printing of the new brochure; so, the court takes the brochure, even though printed after the accident, as evidence of the attitude of the ownership of the company towards the parent and its subsidiaries. All of the companies and branches use the same brochure. A blank space is left for the card of the local representative. The brochure never mentions that any of the subsidiary corporations even exist but lumps them all together in a long list of "distribution centers." Clearly, the Jones people want their customers to think that they are one big company.

The services, such as advertising, safety engineer, safety directions, accounting, etc., are paid for by the four subsidiary corporations on a basis of the percentage of their sales. At a given point in the year, a total of the sales of all five corporations is made. A percentage of the sales of each separate corporation of the total is then calculated. That percentage is then applied to the total costs of services, advertising, etc., which the New York corporation has rendered to the subsidiaries and a figure reached. That is the sum which the subsidiaries reimburse to the parent. The individual corporations are not charged the full services rendered to them but are charged according to their sales relative to total costs.

This case is distinguishable from Turner v. Jack Tar, *supra*. In that case, the plaintiff brought suit in Texas to recover for personal injuries sustained while he was attending a sales convention at the defendant hotel which is located on the Grand Bahama. The hotel was owned by Jack Tar Grand Bahama, Ltd., and was incorporated under Bahamian law. It had no certificate of authority to do business in Texas; no registered office or agent here; owned no property in Texas; and was not in any Texas telephone directory. The accident happened on the Grand Bahama. Jack Tar, Grand Bahama, Ltd., did have some links to Texas; but the Fifth Circuit held that the plaintiff had failed to prove, for purposes of in personam jurisdiction, that the activities in Texas of the Jack Tar Management Company, a Delaware corporation with its principal place of business in Texas and which served the Bahamian hotel as a buying company, could be attributed to its subsidiary, Jack Tar Grand Bahama. In this connection, the court believes it is significant that, unlike the two Jack Tar companies, all the Jones companies perform essentially the same business—that of distributing chemicals nationwide. While the Western Division may distribute and sell only in a certain geographic region, it performs essentially the same function in the west which Jones Chemicals, Inc., the parent corporation, does on the eastern seaboard and which Jones Chemicals, Inc., a New York corporation d/b/a J. W. Jones, Inc., does in Texas.

The instant case most closely resembles Frazier v. Alabama Motor Club, 349 F.2d 456 (5th Cir. 1965). That case decided that for purposes of "doing business" under the federal venue statute, 28 U.S.C.A. § 1332(a) and (c), the activities in the forum of the parent closely-held corporation could be imputed to the subsidiary corporations in various other forums. The auto clubs of several states, none of which was Georgia, were sued in Georgia and service was made on the "management" corporation, National Enterprise, Inc. All the auto clubs of the various states and National were owned by one Bryant. He was the chief officer of all and the principal stockholder, along with his wife and one other individual. National's offices were maintained in Atlanta, Georgia. From this office, Bryant managed, supervised, and controlled each of the auto

club corporations. The many activities were performed by virtue of contracts between the management corporation and each of the auto clubs, but Bryant was acting for both corporations in making these contracts. The corporate activities, except for solicitation of memberships, was centered in Georgia. The Fifth Circuit held that the auto clubs in the various states were managed, directed, and completely controlled by National under the administration of its officers. *Turner, supra,* cited this element of control in *Frazier* as a factor pointing to a relationship stronger than that of the usual parent-subsidiary relationship. 353 F.2d at 956. In *Frazier,* the defendants were not separate corporate entities but integrated subsidiaries of National. "The appearance of corporate autonomy is clearly superficial." 349 F.2d at 460.

In the instant case, too, the five subsidiary corporations are not autonomous units but constitute completely integrated subsidiaries which exist for the convenience of the parent corporation, its stockholders, officers, and directors. Except for the actual sales and services to their local customers, the corporations carry on no local activities. Everything else is done for them in New York just as everything for the sales and services aspect of the New York corporation's business is done for it in New York.

The evidence presented to the court at this point has revealed a situation of complete control of the subsidiary California corporation by the parent New York corporation. Since the New York corporation clearly does business in Texas, the court holds, accordingly, that the activities of the New York corporation in Texas can be imputed to the California corporation. For purposes of Article 2031(b) in personam jurisdiction, the California corporation can be said to be "doing business" in Texas.

This court finds only one potential problem with applying 2031(b) to the California corporation. The language of section 3 of the statute reads, "service of process may be made [upon the Secretary of State] in any action, suit, or proceeding *arising out of such business* done in this State." (Emphasis added.) The Texas courts have expressed the requirement in this way, "The cause of action must arise from, or be connected with, such act or transaction." O'Brien v. Lanpar Co., 399 S.W.2d 340 (Tex. 1966); Sun-X Intern Co. v. Witt, 413 S.W.2d 761 (Civ.App.1967), writ ref'd n. r. e.[1] The potential problem is not hard to resolve, however. In the case at hand, any doubt about whether or not the cause of action "arises from" or is "connected with" the activities carried on in Texas by Jones Chemicals can best be answered by the fact that the activities of Jones Chemicals are carried out on a nationwide scale. The activities which are performed in Texas by the New York parent are the same activities which are performed in Nevada by the California subsidiary. These activities are the same activities which are alleged to have caused the explosion of the chlorine tank in Nevada; and in that sense, the cause of action is connected with the parent's activities in Texas.

■ Now that this court has concluded that 2031(b) applies in this particular situation, the court must answer the question of whether or not its assertion of jurisdiction over the "California corporation" will offend traditional notions of due process and substantial justice. In Jetco, supra, 473 F.2d at 1234, the Fifth Circuit said:

> The governing principle is the fairness of subjecting a defendant to suit in a distant forum. Only if the nonresident defendant has such "minimum contacts" with the state "that the maintenance of the suit does not

1. In light of Eyerly Aircraft Co. v. Jack Killian, 414 F.2d 591 (5th Cir. 1969), and its analysis of *Lanpar* at 595, footnote 12, the court believes that an analysis of a 2031(b) case in strict *Lanpar* terms is not necessary. The language quoted does, however, serve to interpret the statutory language of section 4.

offend 'traditional notions of fair play and substantial justice,' " International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 . . . may the forum, consistently with due process, extend its long arm to embrace it.

If it is legally correct to say that "due process" is nothing more than fundamental fairness, then it is fundamentally fair to subject the Jones companies to the jurisdiction of a Houston federal court for the convenience of Houston residents. Furthermore, it would be fundamentally unfair, under the circumstances of this case, to subject the Houston plaintiffs to the expense and inconvenience of taking themselves, their lawyers, and their doctors to San Francisco or Las Vegas for a trial in a federal court in one of these cities. If, as it has been pointed out, it is of no consequence to the "California corporation" to lend its Western Division manager and a salesman of another wholly-owned subsidiary "corporation" to the New York corporation to enable the New York corporation to establish a branch office in Texas and to spend two weeks out of every month for almost a year for this purpose, then it would be of no consequence to the "California corporation" to bring to Houston, Texas, the necessary employees to testify and to have the necessary members of the "corporate family" in Houston for the purpose of trial. Today, it is folly to assume that any corporation cannot be afforded a fair trial in a federal court in any metropolitan area in these United States be it San Francisco, Las Vegas, New York, or Houston.

Accordingly, it is ordered, adjudged, and decreed that jurisdiction, both personal and subject matter, is present in this court; that service of process is proper as to all defendants; and that venue is proper. All challenges and motions to the jurisdiction and venue by the defendant Jones Chemicals, Inc., Western Division, a California corporation, are hereby denied. All motions to quash service of process are denied.