**WESTCOTT–ALEXANDER, INCORPORATED, also known as Percoflash Manufacturing Corporation, Appellant and Cross-Appellee,**

v.

**Robert J. DAILEY, Appellee and Cross-Appellant.**

**No. 7788.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 21, 1959.

Decided March 11, 1959.

Edward E. Lane, Richmond, Va. (Lane, Rogers & Paul, Richmond, Va., on brief), for appellee and cross-appellant.

Robert Cantor, Richmond, Va. (Cantor, McMullan & Cantor, Richmond, Va., on brief), for appellant and cross-appellee.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and PAUL, District Judge.

HAYNSWORTH, Circuit Judge.

The defendant, a New Jersey corporation having its principal office and plants in that state and never having been domesticated in Virginia, challenges the jurisdiction of the District Court to render judgment *in personam* against it. Since the controversy arose out of the defendant's substantial and continuous activity in Virginia, we think the assertion of jurisdiction was neither unconstitutional nor beyond the reach of the governing laws of Virginia.

The defendant, Westcott-Alexander, Incorporated, manufactures and sells boilers, radiators and auxiliary equipment for heating houses and buildings. It had maintained an agent in Richmond, one Mark Carmen, whose primary duty was the solicitation of business. He was paid $50.00 per week, classified by Westcott-Alexander as an expense allowance from which it made none of the deductions generally required to be made from wages, but which was sometimes described in the testimony as a salary. He also received a commission upon all of Westcott-Alexander's sales to purchasers in Virginia. No stock of goods was maintained in Virginia, and Carmen operated out of his home. He was supplied by Westcott-Alexander with business cards, bearing the trade-mark of that company, upon which appeared Carmen's name, the address of his home and his residential telephone number.

Central heating systems must be planned and designed for each different application, and Westcott-Alexander offered its prospective customers its service in the development of layouts, specifications and plans. When time permitted, Carmen would send architectural drawings, or other data, to Westcott-Alexander in New Jersey, where an engineering staff would make the necessary heat-loss computations, develop specifications and prepare drawings for the heating system which would be returned through Carmen to the prospective customer. When haste was required, Carmen, himself, made the heat-loss computations, developed specifications, and, upon occasion, procured drafting assistance in Virginia to complete working drawings.

Apparently Carmen was not authorized to approve credits, and Westcott-Alexander says he was not authorized to make contracts. It is clear that he was required to consult the home office before making a special price upon large orders, but, inferentially, in his employment letter, he appears to have been authorized to make firm bids on Westcott-Alexander's established terms.

The circumstances out of which the controversy arose are important to the resolution of the question.

Carmen called upon the plaintiff, Dailey, a housebuilder, urging him to use Westcott-Alexander's equipment and

their hot water system instead of the hot air system previously contemplated for fifteen new houses Dailey was then constructing. Dailey was interested, but unfamiliar with the installation and operation of hot water systems for heating residences and providing domestic hot water. Carmen gave him a price quotation which was competitive and introduced to him a plumber, Walker, who was experienced in the installation of Westcott-Alexander's heating systems. Dailey wanted the houses approved for financing through the Veterans' Administration and was in haste to apply for such approval. Since heating diagrams and specifications were a requisite part of the application, Carmen undertook promptly to supply them. From sets of plans of the houses, Carmen took off the data to make the necessary calculations of heat loss, determine the requisite radiation for each room, boiler capacity and other detail, and, with the assistance of a friend employing draftsman,[1] produced drawings which Dailey used in his application to the Veterans' Administration for approval of the construction plans. The heating plans were subsequently submitted to the engineering staff of Westcott-Alexander at its home office; with inconsequential changes, they approved the plans.

During the progress of the work, Carmen stopped by on frequent occasions, not, he said, to supervise the work, but to show his appreciation for Dailey's order. On, at least one occasion, however, he did point out a fault in the installation and suggested its correction. The heating installation was done by Walker, whom Carmen had introduced to Dailey, and everything seems to have been happy until the onset of cold weather.

In November, the purchasers of the first houses completed began to complain, and Dailey complained to West-

cott-Alexander, that the designed system was inadequate to provide the required heat differential or a sufficient supply of domestic hot water. Westcott-Alexander, on successive occasions, sent its officers and others to inspect the systems, found fault with the installation and the controls and undertook to correct the deficiencies. There was abundant testimony, however, that the shortcomings in performance were attributable to the fact that the boilers specified and supplied were of insufficient capacity, that Westcott-Alexander's modifications of the installation failed to improve performance and that substitution of boilers of larger capacity remedied the deficiency.

This action for damages for breach of warranty was commenced by Dailey in the state court. Substituted service was had by service upon the Secretary of the Commonwealth of Virginia. The case was removed to the District Court for the Eastern District of Virginia. A motion to dismiss which questioned the jurisdiction and the sufficiency of the service was overruled, and judgment was entered in favor of Dailey for the direct cost incurred by him in changing the heating systems. Claimed items of indirect expense were disallowed.

We have travelled far since Mr. Chief Justice Taney delivered his famous dictum that "a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created," and found it necessary to resort to principles of comity in order to sustain its right to enforce a foreign bill of exchange it had purchased.[2] As the nation grew and new and swifter methods of communication came into use, business increasingly overlapped state boundaries, and corporate forms of organization became increasingly appropriate for business. Recognition of new, more appropriate, legal concepts traditionally lags

1. The friend made no charge for this drafting service. At about the same time, charges by another for similar drafting services in Virginia were billed to Westcott-Alexander and the bill was paid.

2. Bank of Augusta v. Earle, 13 Pet. 519, 588, 38 U.S. 519, 588, 10 L.Ed. 274, 307.

behind lay acceptance of economic innovation, but legislatures and courts soon evolved means to legalize the corporate conduct of multi-state businesses, and to subject a corporation to process in each state in which it did business. See St. Clair v. Cox, 106 U.S. 350, 1 S.Ct. 354, 27 L.Ed. 222. The consent, sometimes fictional, by means of which a corporation organized under the laws of one state was held amenable to process in another[3] gave way to an indefinite concept of presence, comparable, but far from identical, to the presence of an individual defendant which was the traditional basis of the exertion of the power of the state. That notion, too, has been supplanted in the application of the limitations of the United States Constitution by a more direct and immediate approach to the question of fairness, which arises under the Fourteenth Amendment and which, alone, seems relevant and material. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95.

The earlier use of legal fictions, however, inevitably tortured thought and bred confusion. Consideration of the jurisdictional question was further complicated by the fact that many of the state statutes defined the limits of jurisdictional power in terms of corporations "doing business" within the state while other statutes of the same state imposed requirements of domestication, taxes, restraints and penalties in the same, or similar, language. Not unnaturally, such similarity of language provoked the thought, now, happily, largely exploded, that the dissimilar statutes were conterminous. Judge Learned Hand, who long ago saw the problem in what has since become the perspective of modern thought, was moved in 1930 to say sadly his frequently quoted words, "It is quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass."[4]

Still the confusion persists, and that spawned by Green v. Chicago, Burlington, & Quincy Railway Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916, still leads to contentions, such as here asserted, that the commerce clause of the United States Constitution[5] grants a privilege to foreign corporations to enter a state and there continuously and extensively solicit orders for shipment of goods from other states with immunity from local accountability in causes of action growing out of the sales activity within that state. What the commerce clause has to do with the question of procedural due process is not elucidated,[6] but reference is made to countless cases in which it is declared that "mere solicitation" of orders, without more, is insufficient to subject a foreign corporation to process in the state where the solicitation occurs. The distinction between solicitation and other, frequently far less important, activity may have validity in the context of questions of the extent of the power of the state to tax, regulate and penalize,[7] but if it bears upon the question of jurisdiction to hold the corporation answerable in causes of action arising in the state of the forum, it is far from controlling. International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479, gave a mortal wound to the notion that the distinction was controlling and determinative, and International Shoe Co. v. State

---

3. Lafayette Insurance Co. v. French, 18 How. 404, 59 U.S. 404, 15 L.Ed. 451.

4. Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139, 142. Still earlier he had observed that a finding of "implied consent," or of "presence," was but a conclusion from consideration of the requirements of justice. Smolik v. Philadelphia & Reading Coal & Iron Co., D.C. S.D.N.Y., 222 F. 148.

5. Art. I, § 8, cl. 3.

6. The commerce clause may be involved in a situation such as that before the Court in Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L. Ed. 996.

7. See International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479; Liquid Veneer Corporation v. Smuckler, 9 Cir., 90 F.2d 196; State v. Ford Motor Co., 208 S.C. 379, 38 S.E.2d 242.

of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, laid it away.

The nature and quality of the activity is important, of course, as is its quantity and continuity. The weight to be accorded activity which may be generally characterized as "solicitation," in comparison with that accorded other activity of greater or lesser importance to the achievement of the corporate purposes,[8] we need not consider, however, in disposing of the constitutional issue tendered by the corporation. As is usual in the practical situations in which the jurisdictional question has arisen, substantial and continuous solicitation has been accompanied by other activity. Carmen made computations of heat loss, planned heating systems and supplied diagrams and drawings for use with applications for approval of the construction of houses and in the installation of the systems. There was testimony from which the District Court could find that Carmen regularly inspected the work, and there is no dispute that other officers and servants of Westcott-Alexander, on successive occasions, inspected and modified the installations and corrected supposed fault which they found. If there be a jurisdictional requirement that the local activity consist of something more than "mere solicitation," there was engagement in other kinds of activity. Since the cause of action arose out of the defendant's activity in Virginia, the witnesses were there and the subjects of the controversy were permanently affixed to real estate in that state, fairness requires the defendant to be answerable there. Under these circumstances, to deprive the plaintiff, a citizen of Virginia, of the right to try the cause in Virginia, rather than in New Jersey, would impose upon him an unreasonable burden which could not begin to be justified by any consideration of fairness to this defendant.

If, therefore, the statutes of Virginia purport to make the defendant amenable to its process, no provision of the Federal Constitution stands in the way of its enforcement here. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; Travelers Health Association v. Commonwealth of Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154; International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479. See Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 43 S.Ct. 556, 67 L.Ed. 996.

We come then to the contention that the Virginia statutes do not go to the constitutionally permissible limits. "Doing business," within the meaning of Virginia's service of process statutes,[9]

---

8. Mr. Justice Rutledge pointed out in Frene v. Louisville Cement Co., 77 U.S. App.D.C. 129, 134 F.2d 511, 516, 146 A.L.R. 926, that solicitation of orders is the "heart of business," and may be of much greater relative importance than other activity which, without question, would constitute the basis of jurisdiction to enter a judgment *in personam.*

9. Code of Virginia, 1950, §§ 13–211, 13–217:
   § 13–211.
   (a) "Every corporation incorporated under a jurisdiction beyond the limits of the State (and hereinafter designated as a foreign corporation) shall, before doing business in this State * * * [appoint] the Secretary of the Commonwealth and his successor in office its agent upon whom may be served all lawful process against, or notice to, such corporation * * * obtain from the commission a certificate of authority to transact business in the State. * * *" § 13–217.
   "1. If any corporation, company or society required under the provisions of §§ 13–211 or 13–214 of this Code to appoint the Secretary of the Commonwealth as its agent as above provided shall do business in this State without having so appointed the Secretary of the Commonwealth its agent, it shall by doing such business in the State of Virginia be deemed to have thereby appointed the Secretary of the Commonwealth its true and lawful attorney for the purposes hereinafter set forth.
   "2. When the Secretary of the Commonwealth has been constituted attorney for any such corporation, company or society by its failure to comply with the provisions of §§ 13–211 or 13–214

as interpreted by its highest court, means something more, it is said, than activity which is "mere solicitation" or even solicitation with other activity which is incidental to it.

■ Here we are bound by Virginia's interpretation of the language of her service of process statutes. Even though it may be thought that a narrow interpretation of such a statute was influenced by regard for supposed limitations of the Federal Constitution, a Federal court may not lightly assume that the state court would adopt a broader interpretation after discovery that the constitutional limitations were not so restrictive as had been supposed. Pulson v. American Rolling Mill Co., 1 Cir., 170 F.2d 193; Bomze v. Nardis Sportswear, Inc., 2 Cir., 165 F.2d 33. We need not close our eyes, however, to the evolution of the law in the state courts nor to the expressed reasons for the results reached in particular cases.

In Tignor v. L. G. Balfour & Co., 167 Va. 58, 187 S.E. 468, 472, the Supreme Court of Appeals of Virginia declared at the outset that its decision was controlled by decisions of the United States Supreme Court applying the limitations of the Fourteenth Amendment. Because of Green v. Chicago, Burlington & Quincy Railway Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916, which it felt was still controlling despite International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479, it concluded that solicitation within Virginia was insufficient to make a foreign corporation amenable to

its process, and that the addition of the authorized exercise of some other "essential corporate function, even though slight" was prerequisite to jurisdiction. It is possible the Court might have found in the activity of a district sales manager something more than "mere solicitation," but it clearly was governed by the then current interpretation of decisions of the Supreme Court of the United States restricting the application of similar state statutes. It expressly recognized that its statutory term "doing business" had varying meanings and that given circumstances might justify a conclusion that a corporation was " 'doing business' * * * for one purpose, and not 'doing business' for another."

The defendant, Westcott-Alexander, heavily relies upon Mas v. Owens-Illinois Glass Co., D.C.E.D.Va., 34 F.Supp. 415, for it involved a similar question of Virginia's power to render a judgment *in personam* against a foreign corporation. Of course, it was not state interpretation of state law, and Judge Pollard, as the Supreme Court of Appeals of Virginia in Tignor v. L. G. Balfour & Co., supra, was clearly concerned only with the constitutional limitations upon state power. There is not so much as a passing reference to the language of Virginia's service of process statute, but the Court concluded that Virginia's power was so limited by the Federal Constitution that her process could not reach a foreign corporation whose only business in Virginia was the solicitation of orders and other activity which the Court thought merely incidental to solicitation.[10] Reference

---

before doing business in this State, any lawful process against or notice to such corporation, company or society in any action or proceeding against it growing out of such business may be served on the Secretary of the Commonwealth, and doing such business in Virginia shall be a signification of its agreement that any such process or notice so served shall be of the same legal force and validity as if served upon it in the State of Virginia."

10. What is incidental to solicitation will vary with one's concept of the relative importance to business of solicitation of

orders within an industry, and what might be regarded as valid relation within one industry would seem ridiculous analogy in another. If solicitation is to be differentiated from other acivity in delineating the application of a service of process statute, a very narrow construction of "solicitation" is required. In Tignor v. L. G. Balfour & Co., supra, the Supreme Court of Appeals of Virginia indicated its intention, in applying constitutional restraints, to construe narrowly "solicitation." If Judge Pollard thought solicitation should be given a broader immunity, in the context of the

was made to Tignor v. L. G. Balfour & Co., supra, not as an interpretation of the language of the state statute, but as an exposition of the constitutional restraint upon state power, as those restraints were then conceived.

This precise question was not involved in Travelers Health Ass'n v. Commonwealth, 188 Va. 877, 51 S.E.2d 263, affirmed 339 U.S. 643, 70 S.Ct. 927, 94 L. Ed. 1154, for the proceeding there was founded upon notice issued pursuant to Virginia's Blue Sky Law. Her general statute providing for the service of process in civil actions was not the basis of the asserted jurisdiction, and it may be that Virginia's interest in the enforcement of her police powers is greater than her desire to protect the right of her citizens to local redress against foreign corporations in local causes of action. In affirming the power to act in that case, however, the Supreme Court of Appeals of Virginia relied upon International Shoe Co. v. State of Washington, supra [326 U.S. 310, 66 S.Ct. 158], quoted extensively from it and relied upon its statement of the test of "traditional notions of fair play and substantial justice." It strongly suggests the inclination of Virginia's courts to construe her protective and remedial statutes so as to hold foreign corporations accountable in her courts for wrongs committed in Virginia, except only as that court has felt itself limited by constitutional restraints.

█ The task of projecting ourselves into the mind and philosophy of another court, which is required of us, is not easy. When principles of law are evolving, acceptance of an old decision as a final absolute may be a greater wrong than even an errant attempt to predict what the state court would do if now confronted with the present question. The Supreme Court of Appeals of Virginia has provided us with such clear indication of its approach, however, that

we have no hesitation in declaring that, it has not, by construction, restricted Virginia's service of process statute, nor is it likely to do so, so as to defeat the jurisdiction of her courts in a situation comparable to this. Her service of process statute may or may not be construed as occupying all of "the enclave" [11] opened to her by International Shoe Co. v. State of Washington, but, with the additional activity here present, it is clear that, if Virginia would not have sustained the jurisdiction of her courts prior to International Shoe Co. v. State of Washington, supra, she would have held her hand only out of regard for supposed constitutional limitations. Relieved of that restraint, it seems abundantly clear from what it has held and said that the Supreme Court of Appeals ·of Virginia would not give the service of process statute of that state such a narrow construction as to defeat the jurisdiction of her courts in this situation. See also, Eure v. Morgan Jones & Co., 195 Va. 678, 79 S.E.2d 862.

What we held in Rock-Ola Manufacturing Corporation v. Wertz, 4 Cir., 249 F.2d 813, has no bearing here. There we were concerned with the very different question of whether business conducted in Virginia was that of an independent Virginia merchant or that of the merchant's supplier, a foreign corporation seeking access to Virginia's courts. The question arose, too, under the domestication statute upon an attempt to enforce a harsh penalty, which, in practice, might amount to a denial of all means of enforcement of private rights.

█ Westcott-Alexander next asserts that, if it was doing business when Carmen was acting in its behalf, it was not when the action was commenced, for Carmen had left its employ some months earlier. After the termination of Carmen's employment, however, Westcott-Alexander sent its officers and employees

jurisdictional question, it was because of his understanding of the constitutional restraint, not of restrictive state interpretation of the state statute.

11. Bomze v. Nardis Sportswear, Inc., 2 Cir., 165 F.2d 33.

into the state to make changes in these heating systems, and one of its corporate officers came into Virginia to assemble further information after the action was begun. Such reduction of activity in the state, or a partial withdrawal from it, after the cause of action has arisen, does not defeat the jurisdictional power of the state. Service upon Carmen, when he no longer represented Westcott-Alexander would have been ineffectual, but curtailment of activity did not defeat the power of the state when service is effected upon some active agent, or, as here, there is substituted service. Connecticut Mutual Life Ins. Co. v. Spratley, 172 U.S. 602, 19 S.Ct. 308, 43 L.Ed. 569; French v. Gibbs Corporation, 2 Cir., 189 F.2d 787. Virginia has construed her statutes as authorizing process against a foreign corporation completely withdrawn from the state at the time of service, if the cause of action arose in Virginia out of business previously conducted by the withdrawn corporation in Virginia. Eure v. Morgan Jones & Co., 195 Va. 678, 79 S.E.2d 862. Such an application of her statute encounters no constitutional objection, State of Washington ex rel. Bond & Goodwin & Tucker, Inc. v. Superior Court, 289 U.S. 361, 53 S.Ct. 624, 77 L. Ed. 1256, certainly when, as here, there remains residual activity in Virginia.

■ Clearly without merit is Westcott-Alexander's contention that there was no privity of contract between it and Dailey and that its warranty ran only to the plumber who installed the equipment. The fact that the equipment was shipped on the order of the plumber for delivery to him at Dailey's job sites does not militate against the conclusion that the contract was with Dailey. It was Dailey to whom Carmen undertook to sell the systems and made representations as to their performance; payment for the equipment was made by Dailey's checks, and Westcott-Alexander recognized Dailey as the purchaser when it expressed its responsibility to him and undertook to make the systems function satisfactorily. The plumber,

after having been introduced by Carmen, had been engaged by Dailey to do the work of installation, and it is not unnatural that he should have scheduled the deliveries so that they might promote the progress of his work. In doing so, however, he was merely acting for Dailey who testified this procedure was worked out in preliminary conversations with Carmen. The District Court was clearly warranted in finding Dailey to be the purchaser and that the warranty was made to him directly.

■ Dailey has filed a cross-appeal complaining that he was not allowed items of claimed incidental damage. These items are costs incurred in financing and maintaining the houses, and it is Dailey's contention that they would not have been incurred for so long a period had there been no trouble with the heating systems. The District Court found such damages speculative, and we agree. So many houses are not usually sold in a day, and many were unsold months after the installation of new boilers. How much earlier any or all of them would have been sold had conditions been different is but a hazardous guess. Grubb v. Burford, 98 Va. 553, 37 S.E. 4.

Affirmed.