**INTERPOOL LIMITED, Plaintiff,**

v.

**BERNUTH AGENCIES, INC., Defendant.**

**No. 94 Civil 7394 (CBM).**

United States District Court,
S.D. New York.

March 27, 1997.

---

Kirlin, Campbell & Keating by Michael D. Wilson, James Maloney; Interpool, Inc. (In-House Counsel) by Christopher Fermanis, for Plaintiff.

Anderson & Rottenberg by Mark M. Rottenberg; Lapidus & Frankel by Richard Lapidus, for Defendant.

## FINDINGS OF FACT

MOTLEY, District Judge.

### I. THE PARTIES

1. Interpool Limited ("Interpool") is a Barbados Corporation engaged in the leasing of marine cargo containers to the shipping industry. Trial Transcript ("Tr.") at 8.

2. Interpool was originally a Bahamian corporation, but in May of 1990, it became qualified to do business under the laws of Barbados and continued its corporate existence as a Barbadan corporation. It discontinued its corporate existence as a Bahamian corporation at the same time. Tr. at 181, Pre-Trial Order, Undisputed Facts, # 4.

3. Bernuth Agencies, Inc. ("Bernuth") is a Miami-based shipping agency representing Bernuth Lines, Ltd., which operates a fleet of cargo ships servicing various islands located in the Caribbean. Tr. at 427.

### II. THE AGREEMENTS

4. Effective May 28, 1985, the parties entered into a Membership and Equipment Leasing Agreement (the "Agreement"), which set forth general terms and conditions regarding the leasing of steel containers from Interpool to Bernuth. Tr. at 189–95.

5. Under the terms of the Agreement, when Bernuth found that containers it was leasing from Interpool were unusable or otherwise unsatisfactory, it could "off-hire" them at Interpool's depot, at which time rental charges would cease. Plaintiffs Exhibit 1, art. 9.

6. The Agreement also required that Bernuth pay for any damage done to the containers while they were in its possession. However, wear and tear, as determined by guidelines set by the International Institute of Container Lessors (the "IICL"), was the responsibility of Interpool. Plaintiffs Exhibit 1, art. 9

7. Thus, under the terms of the Agreement, when Bernuth off-hired containers at Interpool's depot, Interpool's depot inspector would inspect them and determine as for each container the amount of damage it had suffered and send an invoice to Bernuth. Bernuth could then pay the invoice or, if it felt that the container was not damaged but had only in fact endured normal wear and tear, it could enter into dispute resolution procedures. Tr. at 18–19.

8. The Agreement also contained a no-oral-modification clause, requiring that any changes to it be in writing and signed by the party to be bound thereby. Plaintiff's Exhibit 1, art. 17.

9. Subsequent to the execution of the Agreement, the parties entered into a Container Lease Agreement on or about July 16, 1986 (the "1986 Lease"). Tr. at 10–12.

10. The 1986 Lease was an addendum to the Agreement and it set forth specific details such as *per diem* rental rates, procedures for dealing with the loss or total damage of equipment, and the permissible uses of the containers. Tr. at 10–12.

11. The 1986 Lease was extended in an Addendum dated April 22, 1988, for one year from that date. Plaintiff's Exhibit 19.

12. The total number of containers leased by Interpool to Bernuth under the 1986 Lease and Addendum is 344. Tr. at 12. Eighty of these were containers which were 40 feet long ("forty foot containers") and 264

of them were 20 feet long ("twenty foot containers"). Tr. at 38–39

13. The Lease and Addendum expired in 1989, and a new lease was arranged for the 344 containers in 1989. Tr. at 11–14. This lease, which was dated November 1, 1990 (the "1990 Lease"), was signed by Bernuth on January 9, 1991 and by Interpool on February 7, 1991. Plaintiffs Exhibit 3; Tr. at 181.

14. The 1990 Lease is also described as an addendum to the Agreement and provided that in the event of a conflict between it and the Agreement, its terms would control. Plaintiffs Exhibit 3.

15. The 1990 Lease sets the replacement values of the twenty and forty foot containers as $3200 and $5400, respectively. However, the values were to depreciate by a rate of 5% a year from the date of manufacture to a minimum of 40% of the original value. Plaintiffs Exhibit 3, sec. 14; Tr. at 16–17.

16. The lease also set a *per diem* rate for the containers. Twenty foot containers were leased at $1.50 a day while the forty foot containers were leased at $2.50 a day. Plaintiff's Exhibit 3, sec. 3; Tr. at 16.

### III. THE DISPUTE

17. In 1992, 59 of the 344 containers became unusable and Bernuth refused to pay for them as a result. Tr. at 27.

18. By fax dated February 25, 1992, Bob Astrin, Interpool's director of operations, instructed Rahamat Ali, Bernuth's equipment control manager, to return the containers to a nearby depot, where they could be off-loaded and an assessment of damage could be made. Defendant's Exhibit A; Tr. at 110.

19. By fax dated March 5, 1992, Mr. Ali suggested as an alternative that a survey be conducted at Bernuth's facility to avoid the costs of moving the containers to the Interpool depot. The fax also said that the off-hire date could be acknowledged as the date of the survey. Defendant's Exhibit B; Tr. at 276–77.

20. By fax dated March 5, 1992, Mr. Astrin agreed to these terms and indicated that an Interpool representative would contact Mr.

Ali to discuss arrangements. Defendant's Exhibit C. Though Mr. Astrin insists that he did not agree to Mr. Ali's idea of making the off-hire date the date of the survey, Tr. at 112, his fax, which indicates a general agreement with Mr. Ali's proposal, would have specifically noted an objection to this provision if there was one.

21. Mr. Astrin also sought and obtained the permission of Mr. Gerald Roof before sending his fax to Mr. Ai. Tr. at 147.

22. Mr. Roof is the vice-president of sales at Interpool and is responsible for, inter alia, promoting the leasing of containers to the steamship industry. Tr. at 8. He was the primary person at Interpool responsible for dealing with the Bernuth account and with the containers in dispute in this litigation and had numerous conversations with Bernuth's president regarding these containers. Tr. at 27–30. He also made settlement offers to Bernuth at various times. Tr. at 53–54. The court therefore finds that Mr. Roof acted under his implied authority as vice-president of sales when he instructed Mr. Astrin to send his fax of March 5, 1992 agreeing to Mr. Ali's terms.

23. Interpool made no further written demands for the return of the containers., although it did periodically request lease payments. Tr. at 217, Plaintiffs Exhibit 22.

24. Mr. Roof indicated that he verbally demanded redelivery of the containers on a number of occasions. Tr. at 28–29. However, the court does not find this testimony credible in light of the fact that Mr. Roof testified during his deposition that he made no such demand. Tr. at 52.

25. Pursuant to Mr. Astrin's fax of March 5, Interpool's general manager of maintenance and repair, Mr. George Michaels, went to the Bernuth yard to survey the containers along with Mr. Ed Hayes, a surveyor employed by American Nautical Services and representing Bernuth. Tr. at 78. Some disputes arose between the parties about what constituted wear and tear and what constituted damage, as a result of which Mr. Michaels did not inspect more than seven units. Tr. at 79–80.

26. Of the units Mr. Michaels did inspect, he reported a great deal of abuse, improper

repair, aggravated rusted areas, and cannibalism. Tr. at 82–83. He issued a report of his findings which indicated that his survey was sufficient to determine that no preventative maintenance had been performed on the containers. Plaintiffs Exhibit 12.

27. As time went on, more containers became unusable and were placed in Bernuth's yard. However, Bernuth never sought nor obtained permission to off-hire these units at their own facility rather than Interpool's. In fact, there is nothing in writing which suggests that Bernuth had informed Interpool that more containers were being taken out of service. Tr. at 317–18.

28. Negotiations between Interpool and Bernuth regarding the unusable containers continued throughout 1992 and most of 1993. Tr. at 53–54.

29. By February of 1993, Bernuth stopped paying for any of the 344 containers involved in this litigation. Tr. at 309; 433–34.

30. On October 14, 1993, the general counsel for Interpool, Christopher Fermanis, sent a letter to Bernuth advising it that Interpool would not hold Bernuth in default for any payments it has failed to tender pending the outcome of a survey to be completed within two weeks of the date of the letter. However, the letter does not indicate that Interpool intends to waive its right to seek these payments. Defendant's Exhibit I.

31. Pursuant to the terms of its letter, Interpool arranged for a second survey to be conducted by Con–Surve, an independent surveying company in October of 1993. Tr. at 115.

32. The Con–Surve report also mentioned severe damage to the containers and states that it appeared as if no preventive maintenance had been performed on the containers. Plaintiff's Exhibit 4.

33. Interpool never advised Bernuth in writing that the survey had been completed, but it is clear that Bernuth knew by December of 1993 that the survey had been conducted. Defendant's Exhibit J. Moreover, Bernuth was made aware of Interpool's position with regard to the containers through numerous phone conversations and during Mr. Roofs visit in October of 1994. Mr. Roof even states the amount of damages he feels his company is due in a letter dated October 7, 1994. Tr. at 221–22; Plaintiffs Exhibit 22.

34. Throughout this entire period, Bernuth was continuing to use some of the containers at issue in this lawsuit. In fact, Bernuth's manifests reveal that it was using these containers as late as 1995. Because the manifests for 1996 are not in evidence, it is not known whether some containers are still being used today. Tr. at 183–88.

35. Shortly before trial, George Braun, plaintiffs expert, went to look at the containers at issue and determined from a cursory inspection that there had been improper maintenance and that the containers were badly damaged and deteriorated. Tr. at 246–49.

36. Mr. Braun is a highly qualified expert who, inter alia, was the co-author of the Guide for Container Equipment Inspection issued by the HCL. Tr. at 241. As was noted above, the Agreement states that what constitutes wear and tear as opposed to damage is to be determined by the standards adopted by the IICL. Plaintiffs Exhibit 1, art. 9.

37. Defendant's expert, Dominquez Digeon, conducted an extensive survey of the containers, inspecting 282 of them individually. Tr. at 394.

38. Mr. Digeon in his first report noted various elements of damage on a particular container. Tr. at 397–98. After turning it in to his employer, however, he was told that he should not concentrate on the damage to the containers but only on the wear and tear. Tr. at 399400. Thus, this report is of little use in addressing the question of whether these containers were unusable because they were damaged or because of normal wear and tear. Tr. at 272–73.

39. Though Mr. Ali testified in general to the high quality of Bernuth's maintenance program, Tr. at 271–73, Bernuth did not have a policy of washing salt water off of the containers after they had been at sea, nor did it "spot paint" the containers to prevent the advancement of corrosion, both of which

were required by the Agreement. Tr. at 335–38. Plaintiffs Exhibit 1, art. 6.

40. The containers at issue were depreciated by Interpool for financial purposes over a 12 1/2 year period, Defendant's Exhibit S, Tr. at 209, which was the expected useful life of the container. Tr. at 210.

41. The vast majority of the containers were over 12 1/2 years old by 1993. Tr. at 211.

42. However, while the 12 1/2 year figure is an accurate estimate of a container's life, it is only an estimate, and Interpool often rented out containers older than 12 years to shipping companies. Tr. at 106–07.

43. In light of the foregoing, the court finds that the containers in dispute are no longer usable largely because of damage and inadequate maintenance on the part of the defendant.

## CONCLUSIONS OF LAW

■ 1. This action arises out of a claimed breach of a lease of ocean cargo containers, which is a maritime contract within this court's admiralty jurisdiction. *CTI–Container Leasing Corp. v, Oceanic Operations Corp.*, 682 F.2d 377, 379–80 (2d Cir.1982).

2. The law of Barbados permits a foreign corporation such as Interpool qualified to do business in Barbados to become a Barbadan corporation after registering on the Barbados Company Registry.

■ 3. Contrary to Bernuth's assertions, it is not repugnant to United States law to recognize the Barbadan law which permits this reincorporation. The state of Delaware allows foreign corporations to reincorporate into its territory on either a temporary or permanent basis. DEL. CODE ANN. tit. 8, §§ 388–89 (1997). New York likewise recognizes that foreign corporations may change their place of incorporation and requires such corporations doing business in New York to make certain filings when changing their place of incorporation. N.Y. Bus. Corp. L. §§ 1308(a)(9), 1309(a)(2), 1309(b), 1309(c) (1997). Defendant's reliance on dicta in a Supreme Court case over 150 years old stating that "a corporation can have no legal existence out of the boundaries of the sovereignty by which it was created" and that "a corporation must dwell in its place of creation, and cannot migrate to another sovereignty," is entirely misplaced for two reasons. *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 588, 10 L.Ed. 274, 308 (1839). First of all, that case dealt with the power of corporations to act extraterritorially, not with their power to reincorporate. Secondly, the opinion, which was written long before the rise of multi-state and multi-national corporations, has been criticized by at least one circuit court as being outdated. *See Westcott–Alexander, Inc. v. Dailey*, 264 F.2d 853, 856 (4th Cir.1959).

4. Thus, as a legal matter, the same party which signed the 1985 Agreement with Bernuth is prosecuting the present action.

■ 5. Mr. Ali's fax of March 5, 1992 was a written request to alter the terms of the lease so that the 59 containers could be considered off-hired at Bernuth's facility rather than Interpool's. Mr. Astrin's reply fax of March 5 consented to those terms and thus satisfied the requirement of the lease that any amendment to the lease be contained in a writing signed by the party to be bound thereby. While Mr. Astrin's fax, written under Mr, Roofs direction, does not state explicitly that he agrees to the off-hire proposal, his general written agreement with the terms of Mr. Ali's fax, which is clear in terms of what it is requesting, is sufficient to constitute a modification of the lease.

■ 6. Even if Mr. Roof did not have the implied authority to alter the terms of the lease for the 59 containers so as to "off-hire" them at Bernuth's facility, it is clear that Mr. Astrin had the apparent authority to do so. In order for an agent to have the apparent authority to conduct business in the name of the principal, two elements must be satisfied: (1) the principal must be responsible for the appearance of the agent to conduct the transaction in question, and (2) the third party must reasonably rely on the representations of the agent. *Herbert Const. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir.1991). Both elements were satisfied in this case. As director of opera-

tions, Mr. Astrin was the Interpool employee authorized to deal with the return of equipment to Interpool's depot. His original fax requesting the return of the containers was fully within his authority, and it created the reasonable impression in the minds of Bernuth employees such as Mr. Ali that he did have the authority to change the location of the off-hire. Moreover, Bernuth reasonably relied on Mr. Astrin's representations that the off-hire date be acknowledged as the date of a survey to be conducted at Bernuth's yard.

7. However, this interchange of correspondence dealt only with the 59 containers at issue in the early part of 1992. As to these containers, Bernuth is excused from paying rental charges. However, as for the balance of the containers, Bernuth is liable for the rental charges which it has failed to pay until the date of August 19, 1994, shortly before commencement of the lawsuit.

8. Bernuth's failure to pay rent for these containers means that they have been constructively lost within the meaning of the Agreement. Plaintiffs Exhibit 1, art. 2. Thus, Bernuth is also liable for the replacement values of these containers.

9. As for the 59 containers, the extensive testimony and the reports of surveyors have indicated that they are damaged beyond repair, and the court has already determined that this was the responsibility of Bernuth. Finding of Fact # 43. As a result, these containers are also deemed constructively lost and Bernuth is liable for their replacement value pursuant to the terms of the 1990 Lease. Plaintiffs Exhibit 3, sec. 14.

10. Interpool requests a prejudgment interest rate of 18% on the grounds that this is the rate contemplated in the agreement. Plaintiffs Exhibit 1, art. 2. It is true that in admiralty cases, absent extraordinary circumstances, a plaintiff is entitled to have prejudgment interest included in its recovery. *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 520 (2d Cir.1993). However, "the rate of prejudgment interest is within the broad discretion of the district court." *Id. Accord Central Hudson Gas & Elec. v. Empresa Naviera*, 56 F.3d 359, 372

(2d Cir.1995); *Magee v. U.S. Lines*, 976 F.2d 821, 823 (2d Cir.1992); *Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981). Moreover, prejudgment interest awards "must not result in over-compensation of the plaintiff." *Wickham Contracting v. Local Union No. 3, IBEW*, 955 F.2d 831, 834 (2d Cir.1992). The plaintiff is entitled only to "the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 311 (2d Cir. 1987) (quoting *Independent Bulk Transp., Inc., v. The Vessel "MORANIA ABACO"*, 676 F.2d 23, 26 (2d Cir.1982)).

11. The court holds that an 18% per annum interest rate would clearly overcompensate Interpool and is not in any way reflective on the income which the damages would have generated. Using its broad discretion, the court determines that 6% is a much more reasonable interest rate that is parallel to the amount of interest that would be earned on short-term, risk-free investments.

12. Interpool similarly requests attorneys fees on the grounds that the Agreement stipulates that Interpool has the right to collect attorneys fees from Bernuth should Bernuth fail to pay the rental charges it owes, thereby requiring Interpool to go to court to obtain these charges. Plaintiff's Exhibit 1, art. 12. However, the rule in admiralty is clear: "the award of fees and expenses is discretionary with the district judge upon a showing of bad faith." *Ingersoll*, 829 F.2d at 309. *See also American Nat. Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 270–71 (2d. Cir.1995) (referring the rule in admiralty law that attorneys fees are not permitted absent a showing of bad faith).

13. Because the court has not found that Bernuth has acted in bad faith, the court will not grant Interpool attorney's fees.

### CONCLUSION

Based on the foregoing, the court awards plaintiff $905,173.43 in damages and interest. The following table indicates the means by which the court arrived at this figure.

| Replacement Values of Containers | Subtotal |
|---|---|
| 80 forty foot containers ($2160 each) | $172,800.00 |
| 264 twenty foot containers ($1280 each) | $337,920.00 |
| Rental Charges until August 19, 1994 (excluding 59 containers) | $272,302.00 |
| Interest 8/19/94–3/15/97 (6% per annum over 2.60 years) | $122,151.43 |
| TOTAL | $905,173.43 |