Gary Joseph GRAPPO, Plaintiff,

v.

**ALITALIA LINEE AEREE ITALIANE, S.p.A. and Gianfranco Bianchi, Defendants.**

No. 93 Civ. 8810 (CBM).

United States District Court, S.D. New York.

Aug. 18, 1997.

William L. Barish, Mount Kisco, NY, for Plaintiff.

Ross & Hardies by J. Joseph Bainton, John G. McCarthy, New York City, for Defendants.

## FINDINGS OF FACT

MOTLEY, District Judge.

### The Parties

1. Plaintiff Gary Grappo is a citizen of the state of Florida. (Pretrial Order "PTO" at 2).

2. Plaintiff is an author of business books and periodicals and a customer service culture development consultant who has over ten years' experience in the fields of human resources and customer service training. (Tr. at 28–30.)

· 3. Defendant Alitalia Linee Aeree Italiane, S.A. ("Alitalia") is an airline incorporated under the laws of the Republic of Italy, with its principal place of business in Rome, Italy. Alitalia's executive office for North America is located in New York City. (PTO at 2.)

4. Defendant Gianfranco Bianchi was Alitalia's Personnel Manager for North America during the time that plaintiff worked for Alitalia. (PTO at 2). Defendant Bianchi has since retired and is no longer employed at Alitalia. (Tr. at 353).

### Guest*Star

5. By 1988, based upon his experience in human resources and customer service training, plaintiff developed a customer service training processing program which he entitled "Guest*Star." (Tr. at 30.)

6. The purpose of Guest*Star is, in plaintiff's words, "to create a service-culture within the organization, a service-minded culture where individuals think of servicing the guests rather than just doing their jobs." (Tr. at 31.)

7. The implementation of Guest*Star involves a number of fairly time-consuming steps. (Tr. at 34.) First, the employees of the business in question are told to complete surveys in order to determine the strong and weak areas within the organization. (Tr. at 32.) The surveys are then analyzed and presented to the senior managers of the business in the form of a report. (Tr. at 33.) Finally, feedback is received from the senior management and the process of training the employees begins. (Tr. at 35).

8. Prior to being employed by Alitalia, plaintiff Grappo had tailored his Guest*Star program in the manner described above for a number of companies, including the Four Seasons U.S.A., the Boca Raton Hotel and Country Club, and the Breakers of Palm Beach. (Tr. at 312–13). Plaintiff was not employed by any of these organizations but rather worked as an outside consultant. (Tr. at 313).

### Plaintiff's Employment with Defendant

9. In the late fall of 1991, plaintiff, responding to an advertisement in the *Miami Herald,* applied for a job with defendant Alitalia as a manager for operations at the Miami International Airport. (Tr. at 36.) Plaintiff's application was rejected, but his resume was retained by defendant. (Tr. at 36.)

10. In January of 1992, an employee of defendant Alitalia called him and informed him that the airline had a position available that required his skills. (Tr. at 36.) Specifically, defendant was seeking to purchase a customer service training program created by a company called Systema (the "Systema program") and it needed personnel to assist in its implementation. After interviewing with defendant Bianchi and another employee of defendant Alitalia, plaintiff was given the job at the end of February, 1992, and he began work several days later. (Tr. at 37, 40.)

### Defendant's Discontinuance of Systema and Subsequent Adoption of Guest*Star

11. In early March, days after his arrival at defendant Alitalia, plaintiff was informed that, due to the relatively high cost of the Systema program, it was appearing increasingly unlikely that defendant Alitalia would be implementing it. (Tr. at 51–52.)

12. Plaintiff then told defendant Bianchi that he thought that his Guest*Star program could be implemented for a fraction of the cost of the Systema program. (Tr. at 52.)

13. Within a day of being so informed, defendant Bianchi told plaintiff that the two of them were going to go to Rome to make a presentation at Alitalia headquarters regarding his Guest*Star program. (Tr. at 53–55.)

14. No promises were made at that time that plaintiff would be separately compensated if defendant Alitalia were to choose to adopt plaintiff's program. (Tr. at 54–55.)

15. Within a few days of returning from Rome, plaintiff was told by defendant Bianchi that the directors in Rome were pleased with his proposal. Plaintiff was then asked by defendant Bianchi to make a similar presentation to the directors of North America, which he soon did. (Tr. at 56–58.)

16. Defendant Bianchi made no promises at that time regarding plaintiff's receipt of compensation for tailoring Guest*Star. (Tr. at 58–59). In fact, plaintiff, himself, testified that until June of 1992, he thought that the company might still purchase the Systema program. (Tr. at 226.)

17. In June of 1992, plaintiff gave to defendant Bianchi a formal proposal for the implementation and use of Guest*Star by defendant Alitalia. (Pl.Ex. 3; Tr. at 61.) In that proposal, plaintiff requested a promotion to "Level One Status", an $80,000 salary, a project bonus of $120,000, and a computer for his exclusive use. (Pl.Ex. 3, p. 4.)

18. Defendant Bianchi orally indicated in response to that proposal that defendant Alitalia would not be able to pay $120,000 as plaintiff had requested but that $50,000 would probably be a more acceptable figure. (Tr. at 316–17.) Defendant Bianchi said he would talk with Mr. Carli, Alitalia's Vice-President for Human Resources, regarding the proposal and inform plaintiff shortly as to Mr. Carli's decision about whether Guest*Star would be implemented.

19. In July of the same year, defendant Bianchi gave plaintiff a handwritten memo which directed plaintiff to begin tailoring the Guest*Star program for defendant Alitalia's needs and goals. (Pl.Ex. 4; Tr. at 68–69.)

20. However, though Mr. Bianchi had preliminarily directed plaintiff to proceed with implementation of the Guest*Star program, he had yet to speak with Mr. Carli regarding the project but said that he would do so in September. (Tr. at 71.)

21. In October of 1992, just before plaintiff was to enter the hospital for minor surgery, Mr. Bianchi informed plaintiff that he had obtained final approval from Mr. Carli to pay plaintiff $50,000 as well as promote him to a Level One position and give him a computer for his own use, in exchange for which plaintiff was expected to implement the Guest*Star program for defendant Alitalia. (Tr. at 72.)

22. The terms of this contract were never set down in writing, but on November 13, 1992, defendant Bianchi and Orazio Corallo, the General Manager for Alitalia's North American office, sent plaintiff a letter indicating that they were giving him a promotion because they were intending to implement his customer service program. (Pl.Ex. 10; Tr. at 228–29.) As a result of the promotion, plaintiff's salary was increased from $4000 a month to $4835 a month. (Pl.Ex. 10.)

23. Moreover, defendant Bianchi included the $50,000 he intended to pay plaintiff in the budget documents which he prepared in October or November of 1992 for fiscal year 1993. (Tr. at 356–57.) These documents were brought with him to Rome for approval by Alitalia headquarters, though top corporate officials in Rome only see a much more concise budget analysis which does not include such comparatively minor expenditures. (Tr. at 363.)

24. Alitalia's 1993 budget for North America was approximately $10 million. (Tr. at 378–79.)

25. The court does not find defendant Bianchi's testimony that he never promised that he would pay plaintiff $50,000 to be credible. (Tr. at 353–54.) Given that plaintiff had originally demanded $120,000, it seems highly unlikely that plaintiff would have agreed to spend the number of hours necessary to tailor Guest*Star without an explicit promise of payment. Moreover, the sum of $50,000 is the approximate amount of plaintiff's annual salary, and it is highly unlikely that, with this amount of money at stake, the parties would have reached some sort of unenforceable "gentlemen's agreement" whereby Bianchi would attempt to get the money if he could, but there could be no guarantees. Doubling an employee's annual salary is not something which is generally done on a gratuitous basis. Finally, the fact

that defendant Bianchi set aside $50,000 in his proposed budget and that he spoke with superiors on this subject is inconsistent with his testimony that he never made a promise to pay plaintiff.

26. The court also does not deem credible Bianchi's claim that he does not have the actual authority to make a contract for $50,000 without obtaining specific approval from Alitalia's headquarters in Rome. (Tr. at 380.) Defendant seems to be making two inconsistent contentions. The first is that the fact that Alitalia's headquarters in Rome approved the proposed 1993 budget submitted by defendant Bianchi, which included the $50,000 expense for plaintiff, did not prove that the top officials at Alitalia had agreed to pay plaintiff that amount of money because the top officials in Rome do not ask that such minor expenses be submitted as part of the proposed budget. The other argument made by defendant is that Alitalia requires each expense other than salary and employee benefits to obtain specific approval from Rome. Defendant cannot argue both propositions; either defendant Alitalia requires specific approval for each project when it approves the budget or it allows its top officials in North America to make minor expenditures without obtaining specific approval. Since this court has concluded that top officials for Alitalia in Rome do not focus upon items such as a $50,000 expenditure on plaintiff's behalf (*see* Finding of Fact ¶ 23, *supra*), the court finds that defendant Bianchi had the actual authority to enter into this agreement.

27. Even if defendant Bianchi did not have actual authority to enter the agreement, the court finds that defendant Alitalia was responsible for the appearance of defendant Bianchi to conduct this transaction. According to the policy of defendant Alitalia, all business expenses which employees such as plaintiff incurred were submitted to defendant Bianchi, and defendant Bianchi had his own policy about what would and would not be reimbursed. (Tr. at 289–90.) Given that defendant Bianchi seemed to exercise a great deal of discretion in setting this policy (Tr. at 290), and given that defendant Bianchi, as Director of Personnel, was plaintiff's immediate supervisor, it would have been reasonable

for plaintiff to rely on defendant Bianchi's representations that he could obtain the $50,000 for plaintiff.

28. The court also finds that defendant Bianchi and all other relevant officers of defendant Alitalia entered into this agreement in good faith, fully intending to implement Guest*Star for defendant Alitalia's North American offices.

### Plaintiff Tailors Guest*Star for Alitalia

29. Beginning in October of 1992, plaintiff began to tailor Guest*Star for defendant under the name "Customers Come First." (Tr. at 107.)

30. Plaintiff prepared surveys to be distributed throughout the month of October, and these surveys were ultimately distributed on October 26, 1992. (Tr. at 82–83, 107; Exs. 6,7.)

31. After the results of those surveys were received, in early November (Tr. at 107), plaintiff began the time-consuming process of evaluating the surveys and creating a report describing the results. (Tr. at 109–110; Ex. 11.)

32. This report was presented to defendant Alitalia's North American managers in December of 1992. (Tr. at 123.) After taking their concerns into consideration, plaintiff developed a training manual and instructor's guide. (Tr. at 124–125.)

33. A final copy of the Customers Come First program was completed at the beginning of January, 1993. Later that month, a pilot group was trained according to the Customer Comes First process. (Tr. at 124–125; Pl.Ex. 12.)

34. Plaintiff has testified that he spent hundreds of hours of his own time preparing Guest*Star. (Tr. at 336.) Approximately one quarter of the work was done during business hours; the remainder of the work was performed on his own time. (Tr. at 165.)

35. In addition to preparing Customers Come First, plaintiff had numerous other responsibilities in connection with his employment, which included recruiting new employees, working in assessment centers wherein employees are evaluated for pro-

motion, and providing employee orientation services. (Tr. at 163–65.)

36. The court finds plaintiff's testimony regarding the time spent on Customers Come First to be credible. Plaintiff spent a great deal of his leisure time in the three and a half months between late October, 1992 and early February, 1993 tailoring Guest*Star for Alitalia. Estimating that plaintiff spent 25 hours of his leisure time tailoring Guest*Star for each of the approximately 14 weeks in question, the court finds that the number of hours spent by plaintiff is 360 hours, which is approximately two months of work. Thus, the reasonable value of plaintiff's services for this amount of time would normally be $8693.05, given that he earned $4000 a month for all but the last six weeks (approximately 150 hours, or .83 months), during which he earned $4835 a month. However, given the fact that this work was done during plaintiff's leisure time, which would naturally be more valuable to him, the court enhances this figure using a reasonable multiplier of 1.6 and thereby values plaintiff's services in tailoring Guest*Star for defendant Alitalia at $13,-908.88.

37. Plaintiff was also told during the late fall and winter of 1992 to assist a Ms. Irene DiNola, an administrator in charge of training for Alitalia (Tr. at 245), in translating a training manual which she had written for the purposes of training personnel in Italy. (Tr. at 245–46.)

38. Plaintiff was also instructed to brief Ms. DiNola on a monthly basis on his program and even allowed her to copy some of his Guest*Star materials and crafts. (Tr. at 157–58.)

39. In February of 1993, a meeting was scheduled for plaintiff to introduce the final manual of Customer Comes First to some of the top level management of defendant Alitalia in North America as well as Rome. (Tr. at 154–55.)

40. At the meeting, Ms. DiNola informed the group that plaintiff's program was terminated and that her program would now be used both in Italy as well as North America. (Tr. at 156.) The reason for the sudden shift was that a new senior vice-president was hired around that time, and he did not wish to use plaintiff's program. (Tr. at 374–75.) Defendant Bianchi then attempted to get plaintiff his money anyway but was unable to do so. (Tr. at 162.)

41. Despite plaintiff's protestations to the contrary (Tr. at 302), it does not appear as if Ms. DiNola's program copies the ideas contained in Customers Comes First. First of all, Ms. DiNola's document (Ex. D) does not repeat any of the phrases, sentences, and paragraphs contained in plaintiff's document (Ex. 12). The language is entirely different (PTO at 3) and the court concludes upon reviewing the documents that plaintiff's ideas are not, as he contends, merely paraphrased in Ms. DiNola's document. Even more importantly, however, given that plaintiff, himself, was partly responsible for translating Ms. DiNola's document in the summer of 1992, one would have expected plaintiff to have said something before he was informed in February of 1993 that his program was no longer to be used in North America if the document were truly little more than a copy of his ideas.

42. The court does not find the testimony of plaintiff's expert regarding the reasonable value of plaintiff's program to be credible. Plaintiff's expert testified that the value of the program would be between $150,000 and $250,000. (Tr at 202.). Given that plaintiff was ready to give the product to Alitalia for one-third to one-fifth of that price, it hardly seems logical to conclude that this figure is accurate. Moreover, it appears as if plaintiff's expert reviewed Ms. DiNola's training program in making this evaluation and had not even seen a copy of "Customers Come First" until a day before he testified. (Pl.Ex. 25; Tr. at 205–07.)

43. However, though defendant Alitalia never used plaintiff's program, it did nonetheless benefit to some degree from plaintiff's work. Plaintiff's extensive surveys were given to large numbers of defendant Alitalia's personnel, were analyzed personally by plaintiff and were discussed with defendant Alitalia's top North American managers. This clearly was of some benefit to defendant Alitalia, which was interested

enough in service culture to implement Ms. DiNola's training program.

## CONCLUSIONS OF LAW

### Breach of Contract

1. Defendant Bianchi had the actual authority to authorize an agreement with plaintiff whereby plaintiff would tailor the Guest*Star system for defendant Bianchi and in exchange defendant Alitalia would, *inter alia*, pay plaintiff $50,000. *See Herbert Const. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993 (2d Cir.1991) (describing actual authority).

2. Even if defendant Bianchi did not have the actual authority to enter this contract, he had the apparent authority. Under New York law, an agent has apparent authority to conduct a transaction with a third party on behalf of a principal if two conditions are met: (1) the principal was responsible for the appearance of authority in the agent, and (2) the third party reasonably relies on the representations of the agent. *Id.* at 993–94; *Interpool v. Bernuth*, 959 F.Supp. 644, 650 (S.D.N.Y.1997).

3. This is a contract for the sale of personal property, and as the Second Circuit has ruled in this very case, oral contracts for personal property cannot be enforced beyond $5000 pursuant to § 1–206(1) of the New York Uniform Commercial Code. *Grappo v. Alitalia*, 56 F.3d 427, 431–33 (2d Cir.1995). Thus, plaintiff cannot be compensated for more than $5000 for a breach of contract.

### Quantum Meruit

4. It is axiomatic contract law that a party to a contract which is held unenforceable because of the Statute of Frauds (as this contract is, beyond $5000) may recover quantum meruit damages. 3 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 534 (3D ED.1961); 2 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 321 ("Vast numbers of cases can be collected supporting the general principle that one who has partly performed in accordance with a contract that is unenforceable by virtue of the statute of frauds [*sic*] can recover the value of his part performance as against a defendant who re-

fuses to perform his part in return"); *Farash v. Sykes Datatronics*, 59 N.Y.2d 500, 503, 465 N.Y.S.2d 917, 918, 452 N.E.2d 1245, 1246 (1983). In the words of Professor Williston in the context of land sales, "[t]he principle is settled practically without dispute that the purchaser of land or an interest therein under a contract which does not satisfy the Statute of Frauds may recover .... the amount which he has paid as a deposit. It would be unjust and inequitable to permit the vendor to retake the possession of the property without repaying the purchase money paid to him." WILLISTON at § 321. This "unjust and inequitable" result is exactly what defendants contend: they argue that even if they had appropriated plaintiff's idea and incorporated it into their own training program, and even if the incorporation of this idea had benefited them hundreds of thousands of dollars, they would still owe plaintiff nothing because the Statute of Frauds renders the contract unenforceable. The case law which defendant cites for this proposition is inapposite: though the language of these cases may be more broad, they only stand for the unenlightening proposition that a party with a valid and enforceable written contract may not recover quantum meruit damages but must rely on the remedy contained in the contract. *See. e.g., Clark–Fitzpatrick v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 192–93 (1987) (stating that "[a] quasi contract exists only in the absence of an express agreement" but only in the context of an earlier statement that "[t]he existence of a *valid and enforceable written contract ...* ordinarily precludes recovery in quasi contract." (emphasis supplied)). This is a far cry from the proposition that a defendant unjustly enriched because it breached an unenforceable contract may keep the benefit of the contract, thereby using the Statute of Frauds to aid in the perpetration of a fraud. Indeed, the Second Circuit has ruled in this very case that a plaintiff barred from enforcing a contract by the Statute of Frauds may nonetheless recover in quantum meruit. *Grappo*, 56 F.3d at 433. Thus, defendant's continued adherence to the proposition that no recovery under quantum meruit is possi-

ble because of the Statute of Frauds is, to say the least, bizarre.

■■■ 5. Under New York law, in order to recover damages under a quantum meruit theory, a plaintiff must show "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Bauman Associates, Inc. v. H & M International Transport, Inc.,* 171 A.D.2d 479, 483–84, 567 N.Y.S.2d 404, 408 (1st Dep't 1991). *See also Umscheid v. Simnacher,* 106 A.D.2d 380, 382, 482 N.Y.S.2d 295, 298 (2d Dep't 1984); *Longo v. Shore & Reich, Ltd.,* 25 F.3d 94 (2d Cir. 1994); *Weinreich v. Sandhaus,* 850 F.Supp. 1169, 1183 (S.D.N.Y.1994), *amended in part on other grounds,* 156 F.R.D. 60 (S.D.N.Y. 1994). Plaintiff is not entitled under quantum meruit to enjoy the benefit of the contract; he is only entitled to be restored to the position he was in before the contract was performed. *Farash,* 59 N.Y.2d at 503, 465 N.Y.S.2d at 918, 452 N.E.2d at 1246.

■■ 6. Plaintiff is entitled to recover quantum meruit damages even if the defendant does not benefit from plaintiff's services. *Id.* at 506, 465 N.Y.S.2d at 920, 452 N.E.2d at 1248.

■■ 7. In its Findings of Fact, the court has found that plaintiff has established each of the four elements listed in Conclusion of Law ¶ 5, *supra,* Findings of Fact ¶¶ 22, 28–33, 35, *supra,* and has concluded that the reasonable value of plaintiff's services from October 1992 until February 1993 is $13,908.88. Findings of Fact ¶ 35, *supra.* Plaintiff is not entitled to recover for any work which he did prior to October of 1993, since it was far from clear at that time that defendant would pay him. Thus he could hardly claim an expectation of compensation, as is required to recover damages under a quantum meruit theory. *See* Conclusion of Law ¶ 5. It was only after an explicit promise of payment was made in October of 1992 that plaintiff can justifiably claim that he expended time and effort expecting to be compensated.

8. Thus, plaintiff's work in preparing Guest*Star was worth $13,908.88. However, because he is entitled to receive $5000 by virtue of the remedy available under contract law (as limited by the relevant Statute of Frauds provision, § 1–206(1) of the New York Uniform Commercial Code), the amount that plaintiff would need to be restored to the position he was in prior to his entering the contract would be $8,908.88.

**Fraud**

9. The court has not found any fraudulent behavior on the part of defendant Bianchi and defendant Alitalia. There is no evidence to support the notion that defendant Bianchi or defendant Alitalia intentionally deceived plaintiff in any manner. Under these circumstances, a cause of action for fraud cannot lie.

### CONCLUSION

For the foregoing reasons, judgment will be entered in favor of plaintiff in the amount of $13,908.88.

### ORDER

For the reasons set forth in the Opinion filed simultaneously herewith, it is hereby ORDERED that judgment be entered in favor of the plaintiff in the amount of $13,-908.88